FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

97 MAY -9 PH 3: 04

U.S. DISTRICT COURT
N.D. OF ALABAMA

RONALD KELLY, et al.,                    }
                                         }
     Plaintiffs,                         }
                                         }
v.                                       }          CASE NO. CV 96-B-1047-S
                                         }
UHC MANAGEMENT COMPANY,                  }
INC., et al.,                            }
                                         }          ENTERED
     Defendants.                         }
                                                    MAY 0 9 1997

### MEMORANDUM OPINION

Currently before the court is defendants' Motion to Stay Further Proceedings Pursuant to

the Federal Arbitration Act. Plaintiffs, African-American men and women, filed the present

action as a putative class action, alleging race discrimination in compensation, advancement

opportunities and the terms and conditions of employment and alleging discriminatory breach of

the defendants' affirmative action plan. Defendants seek a stay in accordance with the Federal

Arbitration Act ("FAA"), 9 U.S.C. §§ 1-15 (1994), as to eleven of the named plaintiffs who

defendants contend have signed arbitration agreements obligating them to arbitrate all employment

disputes, including claims under Title VII and 42 U.S.C. § 1981. Plaintiffs contend that they are

not bound to arbitrate these disputes. As bases for this contention, plaintiffs argue that the FAA

is not applicable to the employment contracts in issue here, that a prior EEOC charge which

included class allegations forecloses sending these plaintiffs to arbitration, and that the agreements

to arbitrate were not made in a knowing and voluntary manner, were induced by fraud, are

contracts of adhesion, and lack mutuality of obligation. Upon careful consideration of the record,

81

the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that the Motion to Stay is due to be granted.

### FACTUAL SUMMARY

Plaintiffs are African-American men and women who bring the present action under Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981 alleging that they have been discriminated against by defendants on the basis of their race. (3d Am. Compl. ¶¶ 21, 25-30, 31-34). Defendants have moved the court to stay the present action with regard to certain of the named plaintiffs who defendants argue have signed valid and enforceable agreements to arbitrate disputes such as the present action.

Angelena Bell, Sharon Blue, Pamela Felder, Bridget Hines, Tunja Sanders, Brenda Smith, Brenda Spencer, Ronn Summerville, Minnie Trusser, Darryl Tucker and Samual Wyatt (collectively, the "arbitration plaintiffs") are all named plaintiffs in the present action. Each of these plaintiffs has signed a "Code of Conduct and Employee Handbook Acknowledgement" form of United HealthCare Corporation ("UHC"). (*See* Ex. B to Defs.' Motion to Stay). The forms signed by these plaintiffs are all the same. They are two page documents and begin with this statement:

> I acknowledge that I have received a copy of the United HealthCare Corporation (UHC) Code of Conduct and the Employee Handbook. I understand that these documents contain important information on UHC's general personnel policies and on my obligations as an employee. I will remain familiar with, and agree to abide by these policies.

(*Id.*) Under the heading "Employee Handbook" and the subheading "At-Will Employment," the forms state:

2

> I understand that the provisions in this Handbook are guidelines and, **except for the provisions of the Employment Arbitration Policy**, do not establish a contract or any particular terms or condition of employment between myself and UHC. None of the policies constitute or are intended to constitute a promise of employment. I further understand that UHC may periodically, at its discretion, change, rescind, or add to any policies, benefits or practices with or without prior notice.

(*Id.* (emphasis added)). Finally, under the subheading "Specific Acknowledgements" and at the

top of the second page (at the bottom of which the employees signed), is a paragraph about UHC's

"Internal Dispute Resolution/Employment Arbitration Policy." That paragraph states:

> These policies provide the opportunity for prompt and objective review of employment concerns. I understand that **arbitration is the final, exclusive and required forum for the resolution of all employment related disputes which are based on a legal claim. I agree to submit all employment related disputes based on a legal claim to arbitration under UHC's policy.**

(Emphasis added).

UHC's Employee Handbook is a multi-page document that contains specifics on the

various policies of the company. Section A-5 of that handbook explains in greater detail the

company's dispute resolution and arbitration policy. Under the heading "Scope of Policy," the

handbook states, in part:

> Arbitration is the final, exclusive and required forum for the resolution of all employment related disputes which are based on a legal claim. If an employment related dispute is not resolved through the IDR [Internal Dispute Resolution] process and the matter is based on a legal claim, any party to the dispute may initiate the arbitration process.
>
> A dispute is based on a legal claim and is subject to this Policy if it arises or involves a claim under any federal, state or local statute, regulation or common law doctrine regarding or relating to employment discrimination, terms and conditions of employment, or termination of employment including, but not limited to, the following: Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Age Discrimination in Employment Act . . . . The Policy covers any dispute subject to arbitration which is brought on or after

3



> the applicable effective date, even if the alleged act or omission occurred prior to
> the applicable effective date.

(Defs.' Ex. A to Motion to Stay ("Employee Handbook") at A5-3). Finally, the Handbook also

states: "UHC reserves the right to alter, amend, modify, or revoke the Policy at its sole and

absolute discretion at any time with or without notice. The senior executive of Human Resources

has the sole authority to alter, amend, modify or revoke the Policy." (*Id.*)

As part of their opposition to defendants' Motion to Stay, the arbitration plaintiffs

challenge the validity of their signing of the acknowledgment forms. Thus, a fairly exhaustive

recitation of the facts surrounding the introduction of the arbitration policy and the actual signing

of the acknowledgments is necessary.

In October 1995, UHC began paving the way for the implementation of its new arbitration

policy in Birmingham, Alabama. Blair Suellentrop, the Chief Executive Officer of United

HealthCare South, wrote a letter to all of the employees of UHC in Birmingham, informing them

of the upcoming arbitration policy. (Suellentrop Aff. ¶ 3; Ex. A to Suellentrop Aff.). In

November 1995, Gerriann Fagan[1] sent a memorandum to all employees of UHC in Birmingham.

(Fagan Aff. of Feb. 4, 1997 ("Fagan Aff. III"[2]) ¶ 4). That memorandum explained the effect of

the then-soon-to-be-implemented arbitration policy: "In the unusual situation when the use of IDR

does not fully resolve your employment concern you and UHC will submit any remaining legal

issues to an independent, neutral arbitrator provided by the American Arbitration Association.

---

[1]   Gerriann Fagan is the Director of Human Resources for United HealthCare in the
Birmingham, Alabama office. (Fagan Aff. III ¶ 2).

[2]   Ms. Fagan gave three affidavits as evidence regarding the defendants' Motion to Stay.

4

Arbitration decisions will be binding on both you and UHC." (Ex. B (Tab A) to Defs.' Reply Br.

filed Dec. 17, 1996 ("Fagan Memo.")). The IDR Policy and Arbitration Policy Summary were

both attached to this memorandum, (Fagan Aff. III ¶ 4), and the memorandum stated:

> [T]he IDR policy and a summary of the Arbitration policy are attached for your
> review. If you would like more information, you may obtain a complete
> Arbitration policy from me or your Human Resources Representative. If you have
> further questions about this policy or would like more information, feel free to give
> us a call.

(Fagan Memo.). Although some of the arbitration plaintiffs state that they do not recall receiving

Ms. Fagan's memorandum of November 1995, none of the arbitration plaintiffs specifically denies

receiving the memorandum. (*See, e.g.,* Aff. of Angelena Bell of January 16, 1997 ("Bell Aff.

I") ¶ 9).[3] Finally, on November 9, 1996, all supervisors and managers received training regarding

the IDR and arbitration policies. (Fagan Aff. III ¶ 7).

Additionally, in November 1995, UHC began training its employees in the IDR and

arbitration policies. (*Id.* ¶ 5). Ms. Fagan conducted the training for the accounting (including

enrollment, billing, accounts payable, client reporting and financial reporting), marketing, and

sales administration departments. (*Id.* ¶ 6). According to Ms. Fagan, at these departmental

meetings she told the employees that "as a condition of employment they were expected to resolve

employment concerns and/or disputes through the IDR and Arbitration Process." (*Id.*) Ada

Pritchett, a Human Resources Representative in the Human Resources Department of United

---

[3] Pam Felder initially stated that she did not recall receiving this memorandum. In preparing
for her deposition in this matter, however, a copy of this memorandum was found in her possession
by her attorneys. (Ltr. to the Court of March 17, 1997). Furthermore, although Minnie Trusser's
affidavit asserted that she did not recall receiving the memorandum, she stated in her deposition that
she did receive it. (Trusser Dep. at 354 (attached to Defs.' Motion to Strike the Affidavit of Minnie
Trusser)).

HealthCare in Birmingham conducted the IDR and arbitration policies training for the customer

service department on November 21, 1995. (Pritchett Aff. ¶ 3).

In February 1996 UHC began distributing the new employee handbooks and having

employees sign the acknowledgment forms. On February 6, 1996, Shannon Moore, who was then

the Payroll Processor in the Human Resources Department in Birmingham, sent a "broadcast e-

mail" to all UHC employees, which stated:

> Within the next few days your supervisor . . . will be giving you a revised edition
> of the employee handbook. Please take the time to read the new handbook, as a
> lot of policies have been updated. Your supervisor will be asking you to sign and
> return an acknowledgement form that will address some of the key policies in the
> handbook. If you have any questions about the new handbook[,] please ask your
> supervisor or HR Representative. Your supervisor has a deadline of February 16,
> 1996 for getting the handbooks out to you and the acknowledgement forms signed
> and returned to Human Resources. Thank you.

(Moore Aff. ¶ 3; Ex. A to Moore Aff.). On or about February 7, 1996, all supervisors were

given the new handbooks and acknowledgment forms to distribute to their employees. Ms. Moore

wrote a memorandum that was included with the handbooks and acknowledgments. (Moore Aff.

¶ 4). That memorandum stated: "Please give each employee listed [on the check-off list] a new

handbook; have them read, sign and return to you the acknowledgement form from the new

handbook . . . ." (Ex. B. to Moore Aff.). The memorandum also stated: "All acknowledgement

forms are due to me no later than February 16, 1996. (*Id.*)

As noted above, each of the arbitration plaintiffs signed an acknowledgment form. (*See*

Ex. B to Defs.' Motion to Stay). Pamela Felder signed on February 8, 1996; Angelena Bell,

Sharon Blue, and Bridget Hines signed on February 9, 1996; Tunja Sanders and Ronn

6

Summerville signed on February 12, 1996; Brenda Smith, Brenda Spencer and Darryl Tucker[4]

signed on February 13, 1996; Minnie Trusser signed on February 16, 1996; and Samuel Wyatt

signed on February 21, 1996. Each of these plaintiffs have raised specific challenges to their

signatures based on the circumstances surrounding their signing these forms. Because of these

challenges, the court will examine those circumstances in some detail.

With regard to her signing of the acknowledgment form, Angelena Bell stated:

> On the day I signed the form, my supervisor at the time, Debra Nickolson, walked up to my desk with the form in her hand and told me to sign it immediately because she had to hand it in to the human resources department within an hour. When Ms. Nickolson approached me and told me this, I was on the telephone with a customer. Ms. Nickolson was holding a stack of papers in her hand, which I assumed were Employee Handbook inserts, given the title of the form, "Employee Handbook Acknowledgment." After I signed the form, and Ms. Nickolson gave me the papers, I saw that they were indeed inserts for the Employee Handbook.
>
> I never had an opportunity to read the Code of Conduct form before I signed it. I did not feel it was necessary to read the form, because I assumed it was exactly what it stated it was in bold letters at the top: **Code of Conduct and Handbook Acknowledgment.** Moreover, I felt pressured to sign the form on the spot because my supervisor demanded that I sign it immediately.
>
> I had no idea that I was signing an agreement to arbitrate employment disputes at UHC.
>
> No one at UHC explained to me that the form I was about to sign obligated me to arbitrate employment disputes at UHC.
>
> No one at UHC ever met with me to explain the arbitration policy or the agreement to arbitrate.

(Bell Aff. I ¶¶ 3-7).

Debra Nickolson disputes Ms. Bell's recollection of the events surrounding Ms. Bell's

signing of the acknowledgment form. According to Ms. Nickolson, Ms. Bell had more time:

---

[4] Darryl Tucker signed on either the 13th or the 14th. On the form, the "3" and the "4" are written together with one meant to replace the other, but the court cannot tell which is correct, and the parties did not clarify this minor point.

At least two days prior to February 9, 1996, I asked Ms. Bell to give me her old employee handbook, and in exchange, I presented her with a copy of the new employee handbook, including the IDR policy. At that time, I told Ms. Bell that if she had any questions, she could come and see me about them, or the Human Resources representative, any time she wanted.

The new handbook was contained in a plastic binder, with United Health Care's logo on the cover. I gave Ms. Bell the new employee handbook after her shift ended, sometime between 4:00 p.m. and 4:30 p.m. I did not give Ms. Bell either a time or a date when she was supposed to sign and return to me the acknowledgement that she had received the new handbook and agreed to the IDR policy. I did not tell Ms. Bell that she had to sign her acknowledgment at that time and return it within an hour. Ms. Bell gave me her signed acknowledgment form on February 9, 1996.

On February 9, 1996, Ms. Bell came to my desk and handed me her signed form acknowledging her receipt of the employee handbook and her agreement to the IDR policy. We exchanged no words. She asked no questions. I asked no questions. Neither Ms. Bell nor I were on the telephone when Ms. Bell handed me her signed acknowledgment form.

(Nickolson Aff. ¶¶ 14-15).

Ms. Bell, in turn, disputes this recounting of the events surrounding her signature. Although Ms. Nickolson stated that she exchanged the new handbook for Ms. Bell's old handbook, Ms. Bell claims that she never gave Ms. Nickolson her old handbook. (Bell Aff. of February 24, 1997 ("Bell Aff. II") ¶ 4). In fact, Ms. Bell claims that the old handbook is in the possession of her attorneys.[5] (Id.)

Pamela Felder also claims that Debra Nickolson gave her less than an hour to sign the acknowledgment form. She claims that Ms. Nickolson gave her the form after 4:00 p.m. on the day she signed the form and stated that the form must be returned by 5:00 p.m. that day. (Felder Aff. of January 16, 1997 ("Felder Aff. I") ¶ 3). According to Ms. Felder, Ms. Nickolson stated that the form would be explained later at a staff meeting and that, "by signing the acknowledgment

---

[5] No one has produced this handbook for the court.

8

form it only meant that [Ms. Felder] acknowledged receipt of the Code of Conduct Employee Handbook, not that [she] agreed with its contents." (*Id.*) Furthermore, Ms. Felder claims that she tried to take the form without signing it but that Ms. Nickolson would not allow her to leave without signing the form. (*Id.*) Finally, Ms. Felder stated:

> I never had the opportunity to read[] the Code of Conduct form before I signed it. At the time that I initially signed the agreement, I had no idea that I was signing an agreement to arbitrate employment claims. At the time that I signed the Code of Conduct form, I had no idea that I was agreeing to arbitrate employment disputes at UHC.

(*Id.* ¶ 6).

Ms. Nickolson, again, offers a different version of events surrounding Ms. Felder's signing of the acknowledgment form. She states that she gave Ms. Felder the new handbook and acknowledgment form "[a]t least one day prior to February 8, 1996," in exchange for Ms. Felder's old handbook. (Nickolson Aff. ¶ 20). Ms. Nickolson also asserts that she did not give Ms. Felder either a time or a date on which to return the signed form and that she did not require Ms. Felder to sign the form by 5:00 p.m. (*Id.*) Furthermore, Ms. Nickolson stated that she did not refuse to allow Ms. Felder to leave work without signing the form. (*Id.*) Ms. Nickolson also denied that she ever told Ms. Felder that signing the form meant only that Ms. Felder was acknowledging receipt of the handbook. (*Id.* ¶ 22). Finally, Ms. Nickolson stated: "I never said or did anything to put pressure on any employee to get the[m] to sign the form acknowledging their receipt of the handbook and agreement to the terms of the IDR policy." (*Id.* ¶ 27).

Sharon Blue contends that on the day that she signed the acknowledgment form she attended a department meeting held by Gerriann Fagan and that Ms. Fagan gave conflicting information concerning the IDR and arbitration policies. (Blue Aff. ¶ 3). According to Ms. Blue,

9

Ms. Fagan stated that arbitration was the preferred method of dealing with internal disputes rather than the required method of dealing with those disputes. (*Id.*) Furthermore, Ms. Blue claims that Megan Balazik, the Manager of Enrollment (the department in which Ms. Blue worked), stated that signing the form meant only that Ms. Blue was acknowledging receipt of the handbook and not that she agreed with the contents of the documents. (*Id.* ¶ 5). Accordingly, Ms. Blue stated: "I believe that I have been intentionally mislead [sic] by United Health Care concerning signing this document." (*Id.*)

Bridget Hines also claimed that she was told by Megan Balazik that signing the acknowledgment form indicated only that she had received the documents and not that she agreed with the contents. (Hines Aff. ¶ 4). Furthermore, she contends that she was not given an opportunity to "read the Code of Conduct" before she signed the form. (*Id.* ¶ 5). Nevertheless, Ms. Hines admits that she was told by Gerriann Fagan at an employee meeting that the company was establishing an arbitration policy and that problems would be arbitrated by an outside arbitrator. (*Id.* ¶ 3).

Megan Balazik disputes the facts presented by Ms. Blue and Ms. Hines. According to Ms. Balazik, both of these plaintiffs were given more than a day to review the Employee Handbook and the acknowledgment form before they were required to return the form. (Balazik Aff. ¶ 4). Furthermore, Ms. Balazik denied ever telling either Ms. Blue or Ms. Hines that their signatures merely acknowledged receipt of the handbook and did not mean that they agreed to the policies in the handbook. (*Id.* ¶ 5).

Tunja Sanders was given the acknowledgment form one afternoon, signed it, and returned it to Human Resources the next morning. (Sanders Aff. ¶ 3). She claims that no one at UHC

10

explained to her that the form she was signing obligated her to arbitrate employment disputes. (*Id.*)

Ronn Summerville asserts that his manager, Kenneth Moore, told him that signing the acknowledgment form meant only that Mr. Summerville was acknowledging receipt of the handbook. (Summerville Aff. ¶ 3). Furthermore, Mr. Summerville contends that Mr. Moore made him sign the form "on the spot," and that he never had an opportunity to read the form before he signed it. (*Id.* ¶ 4). Finally, Mr. Summerville stated that he had no idea that he was signing an agreement to arbitrate employment disputes and that no one at UHC explained that he was signing an agreement to arbitrate those disputes. (*Id.* ¶¶ 5-6).

Kenneth Moore asserts that he conducted a meeting at which Ronn Summerville was present in which Mr. Moore discussed the arbitration policy. (K. Moore Aff. ¶ 5). Furthermore, Mr. Moore stated that all employees in his department, including Mr. Summerville, were given several days to review that handbook prior to being asked to sign the acknowledgment form. (*Id.* ¶ 6). Mr. Moore stated that he did not demand that Mr. Summerville sign the form at the same time he gave Mr. Summerville the handbook and that he did not require Mr. Summerville to sign the form "on the spot." (*Id.* ¶¶ 7-8).

Brenda Smith stated that she attended the meeting held by Gerriann Fagan in which the arbitration process was explained but that Ms. Fagan "explained that the arbitration process was one avenue that could be taken to resolve employment problems, however, that it was not the exclusive outlet for the resolution of these problems." (Smith Aff. ¶ 3). Ms. Smith stated further that she believed Ms. Fagan "intentionally mislead [sic] employees, to believe that they did not have to file arbitration claims if they did not want to." (*Id.*)

Ms. Smith was given the acknowledgment form and told that she had to sign and return it the next day. (*Id.* ¶ 4). Ms. Smith stated that she felt pressured to sign the form and understood that signing was mandatory. (*Id.*) Furthermore, she claims that at the time she signed the form she had no idea that she was agreeing to arbitrate employment disputes at UHC. (*Id.*)

Brenda Spencer was given the acknowledgment form to sign and told that she needed to return it by the end of the day. (Spencer Aff. ¶ 3). She stated that she did not feel particularly pressured to sign the form, perhaps because she was not aware of the arbitration policy. (*Id.*) Somewhat contradictorily, Ms. Spencer also stated:

> I never had an opportunity to read the Code of Conduct form before I signed it. I did not feel it was necessary to read the form, because I assumed it was exactly what it stated it was in bold letters at the top: **Code of Conduct and Handbook Acknowledgment.** Moreover, I felt pressured to sign the form on the spot because my supervisor demanded that I sign it immediately.

(*Id.* ¶ 4). Finally, Ms. Spencer asserts that she had no idea that she was signing an agreement to arbitrate and that no one at UHC had explained to her that she was signing an agreement to arbitrate. (*Id.* ¶¶ 5-6).

Tracy Oliver, the supervisor of both Ms. Smith and Ms. Spencer at the time, stated that she held a departmental staff meeting shortly after Gerriann Fagan distributed her November 14, 1995 memorandum. (Oliver Aff. ¶ 6). Ms. Oliver recalls having full attendance at that meeting. At that meeting she explained that all the employees should have received a copy of the IDR and arbitration policies along with Ms. Fagan's memorandum and that the employees would be receiving training on these policies in the future. (*Id.*) According to Ms. Oliver, sometime after that meeting, Ms. Fagan conducted a training session regarding IDR and arbitration for Ms. Oliver's department and others. (*Id.* ¶ 7).

12

Darryl Tucker[6] stated in his affidavit, "I never had an opportunity to read the Code of Conduct form before I signed it." (Tucker Aff. ¶ 4) He went on to say, "I did not feel that it was necessary to read the form, because I assumed it was exactly what it stated it was in bold letters at the top . . . ." (*Id.*) Mr. Tucker also stated, however, that he attended a meeting that was held to discuss the Code of Conduct Employee Acknowledgement Form. (*Id.* ¶ 3). Tammy Adcock[7] stated in her affidavit[8] that in November 1995 she attended a meeting for supervisors and managers to discuss the IDR and arbitration policies at which Mr. Tucker was present. (Adcock Aff. ¶ 4). Furthermore, Mr. Tucker signed the attendance sheet for the supervisor training meeting on the IDR and arbitration policies held on November 9, 1995. (Fagan Aff. ¶ 7; Ex. A to Fagan Aff.). Finally, Mr. Tucker stated: "I had no idea that I was signing an agreement to arbitrate employment disputes at UHC. Arbitration was never mentioned. No one at UHC ever explained to me that the form I was about to sign obligated me to arbitrate employment disputes at UHC." (Tucker Aff. ¶¶ 5-6).

Minnie Trusser was a Benefits Specialist in the Claims department at the time she signed the acknowledgment form. (Trusser Aff. ¶ 2). She stated that on the day that she signed the form, she was told at a meeting that signing the form meant only that she acknowledged "receiving

---

[6] Darryl Tucker worked in the Accounting Department as an Accounts Payable supervisor in February 1996 when he signed the acknowledgment form. (Tucker Aff. ¶ 2).

[7] Tammy Adcock is the Director of Accounting at United HealthCare. As such, she oversees the Enrollment Department, Accounts Payable, Client Reporting, Financial Reporting and Billing. (Adcock Aff. ¶ 2).

[8] The court uses the term "affidavit" loosely. The document was actually an unsworn, un-notarized "statement," for want of a better name. Because plaintiffs did not move to strike it, however, the court will treat it as an affidavit for purposes of this motion.

13

the inserts for the Employee Handbook" and not that she necessarily agreed with the new policies. (*Id.* ¶ 3). Although she does not recall the time at which she received the acknowledgment form to sign, she was told that she had to return the signed form by the end of the day. Thus, she stated that she felt pressured to sign the form. (*Id.* ¶ 4). Finally, she stated that she did not receive the "inserts" for the employee handbook until after she had signed the acknowledgment form. (*Id.* ¶ 5).

Samuel Wyatt was a Programmer Analyst IV in the Information Systems and Technology Department at the time he signed the acknowledgment form. (Wyatt Aff. ¶ 2). Mr. Wyatt stated that he felt pressured to sign the form "on the spot" because his supervisor "demanded that I sign it by the end of the day." (*Id.* ¶ 3). Mr. Wyatt stated that it was never explained to him that the form contained an arbitration agreement and that he "had no idea that [he] was signing an agreement to arbitrate employment disputes at UHC." (*Id.* ¶¶ 3-4). Mike Rowe, a unit manager of the department in which Mr. Wyatt was an employee, stated the he recalled all employees in his area, including Mr. Wyatt, receiving a copy of Ms. Fagan's November 14, 1995 memorandum. (Rowe Aff. ¶ 4). Furthermore, Mr. Rowe stated that employees in his area were not asked to sign the acknowledgment form on the same day that they received the handbook and form. (*Id.* ¶ 5).

According to Gerriann Fagan and Shannon Moore, the acknowledgment forms were distributed with the handbooks rather than separately from them. (Fagan Aff. ¶ 10; Moore Aff. ¶ 4). In fact, the acknowledgment forms were located in the front of the handbooks and were distributed as part of the handbooks. (Fagan Aff. ¶ 10; Moore Aff. ¶ 4).

14

All of the arbitration plaintiffs made statements similar to the following:

> I was never told by anyone at UHC, nor was there any suggestion on the Code of Conduct form that I signed to consult with an attorney before I agreed to arbitrate disputes and thereby waive my rights to a judge and jury and potential damages under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.
>
> If I knew the form I signed involved the waiver of my legal rights, I would have consulted with an attorney if I had more time to evaluate the arbitration agreement.
>
> At the time I signed the code of conduct form, I had no idea, nor was I informed by UHC, that Roderick Jones had filed a charge of racial discrimination against UHC on behalf of black employees as a class.
>
> If I had known that by signing the code of conduct form and thereby the arbitration agreement, I was possibly removing myself from participating in this legal action, I would never have agreed to sign the form prior to consulting an attorney.
>
> . . .
>
> I was never told that I could negotiate the agreement to arbitrate like Lloyd Balfour did. . . . If I had known I could agree to arbitrate and still maintain my right to file suit in court with all the privileges under the law, I would have done so.

(Smith Aff. ¶¶ 8-13;[9] *see, e.g.*, Spencer Aff. ¶¶ 10-13; Tucker Aff. ¶¶ 8-12).

On November 17, 1995, Wendy Evesque, a Human Resources Representative in the Human Resources Department, sent an electronic mail message to the employees in the Network Services Department in an effort to clarify the IDR and arbitration policies. (Evesque Aff. ¶ 3). No evidence was presented that any of the arbitration plaintiffs saw this e-mail prior to signing an acknowledgment form. The message stated:

> During our meeting this morning, the question was asked that if a problem went all the way through the arbitration process and the employee did not agree with the decision then could a lawsuit be filed or could a charge be filed with the EEOC. The clarification that I received from UHC is as follows: Any employee has a right at anytime to sue anyone for any reason, likewise, any employee may contact the

---

[9] Brenda Smith's affidavit contains two paragraphs numbered "8." This passage begins with the second paragraph "8."

EEOC at any time. The IDR and the Arbitration policies are in place as an effective, fair, objective and more timely alternative. We do expect, as a condition of employment, that employees will go through this new process to resolve disputes and that those disputes will be handled fairly and without retaliation. Please let me know if you have any questions or would like to talk individually about the policy in more detail. Again, thanks for allowing me to come to your department meeting today.

(Ex. A to Evesque Aff.).

Finally, on the day that Lloyd Balfour (who is not one of the arbitration plaintiffs) signed the acknowledgment form, he wrote a letter to Human Resources detailing his understanding of the arbitration policy as was explained to him by Wendy Evesque. (Balfour Aff. ¶ 2-4). The letter stated, in part:

My signature [sic] of acknowledgment is ONLY binding if UHC accepts the following conditions that Wendy Evesque of UHC's Human Resources explained to me about the "POLICY" during our telephone conversation on Thursday, February 15th at about 5:30 pm.
1. For any legal claim existing both before and after the effective date of the "POLICY," it is NOT mandatory for me to use the IDR/Employment Arbitration Policy (Section 5a in the Handbook). It is up to me to choose the "POLICY" or any other available/alternative legal resolution method to resolve any legal claim. The other alternative legal resolution methods could include but is [sic] not limited to filing an EEOC claim and persuing [sic] the right to sue in using the traditional legal court system.
2. Any pending legal claim I have is not subject to this "POLICY."
3. The "POLICY" is regarded by UHC as a PREFERRED method of resolving Employment Related conflicts; therefore, I'm not compelled to use this method to resolve any Employment related legal claims existing both before and after the effective date.
Wendy Evesque clearly explained that the three (3) conditions listed above are a part of the "POLICY."
Most important, it is understood that my signature [sic] is valid ONLY if UHC acknowledges that the above conditions were explained to me by Wendy Evesque as part of the "POLICY." Otherwise, my signature [sic] becomes void.

(Ex. A to Balfour Aff.). This letter was sent on February 15, 1996. (Balfour Aff. ¶ 2).

16

## DISCUSSION

The Federal Arbitration Act ("FAA") evinces "a liberal federal policy favoring arbitration

agreements . . . ." *Moses H. Cone Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

Section 2 of the FAA states:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (1994).  Section 3 of the FAA provides for a stay of judicial proceedings while the

parties have an opportunity to arbitrate a dispute referable to arbitration:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (1994).  Defendants seek a stay of the present action with respect to the arbitration

plaintiffs on the basis of § 3 of the FAA.

Statutory claims such as those at issue here are subject to arbitration in accordance with

a valid agreement to arbitrate.  The Supreme Court has held that agreements to arbitrate claims

under the ADEA are enforceable.  *Gilmer v. Interstate/Johnson Lane Corporation*, 500 U.S. 26-

27 (1991).  On the basis of *Gilmer*, the Eleventh Circuit has concluded that claims under Title VII

are also "subject to compulsory arbitration."  *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d

17

698, 699 (11th Cir. 1992) (per curiam).  Plaintiffs have alleged violations of Title VII and 42

U.S.C. § 1981, and plaintiffs have offered no argument or evidence that § 1981 claims should be

treated any differently with respect to arbitrability than claims under Title VII.  Therefore, the

court is of the opinion that all the claims brought by the arbitration plaintiffs are subject to

compulsory arbitration, provided that valid and enforceable arbitration agreements exist.

All of the arbitration plaintiffs have signed a Code of Conduct and Employee Handbook

Acknowledgment Form and received an Employee Handbook.  The court is of the opinion that

the arbitration agreements are contracts "evidencing a transaction involving commerce."  The

Supreme Court has determined that "involving commerce" is equivalent to "affecting commerce"

and signals an exercise of the full extent of Congress's power under the Commerce Clause.

*Allied-Bruce Terminix Companies v. Dobson*, 115 S. Ct. 834, 839 (1995).  No one disputes that

under this definition, the arbitration agreements in issue "involve commerce."  Thus, under § 2

of the FAA, the arbitration agreements are "valid, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Plaintiffs

challenge both the applicability of the FAA to the present agreements and the validity and

enforceability of the contracts themselves.  Those arguments will be addressed below.

**I. Contract of Employment**

Plaintiffs' first challenge to the issuance of a stay pursuant to § 3 of the FAA is that the

contracts in question are contracts of employment and, as such, are not subject to the provisions

of the FAA.  Section 1 states, in part, "but nothing herein contained shall apply to contracts of

employment of seamen, railroad employees, or any other class of workers engaged in foreign or

18

interstate commerce." 9 U.S.C. § 1 (1994). Plaintiffs argue that they are engaged in interstate commerce, and, therefore, the FAA does not apply to their contracts.

Neither the Supreme Court nor the Eleventh Circuit has decided the proper scope of the § 1 exclusion. *See Rojas v. TK Comm., Inc.*, 87 F.3d 745, 747-48 & 748 n.2 (5th Cir. 1996) (noting that the Supreme Court refused to decide the issue in *Gilmer* and listing the circuit courts that have addressed the issue). The question is whether or not the "catch-all" phrase "or any other class of workers engaged in foreign or interstate commerce" is to be read broadly or narrowly. Plaintiffs argue for a broad reading that would exclude all contracts of employment. Defendants argue that the exclusion should be read narrowly to apply only to contracts of employment of those workers actually engaged in the movement of goods in interstate or foreign commerce. The court is of the opinion that the exclusion should be read narrowly.

The majority of circuits that have addressed the scope of the § 1 exclusion have concluded that it should be read narrowly. *See id.* at 748. Plaintiffs' construction of the language would have it be read, "all contracts of employment." Such a reading, however, would make the specific enumeration of "seamen and railroad employees" meaningless. *See id.* (citation omitted). If Congress had intended the exclusion to apply to all contracts of employment, it could have said just that—e.g., "nothing herein contained shall apply to any contracts of employment." *See id.* Congress did not do so. Thus, the court is of the opinion that the clause should be read narrowly to give the entire clause meaning and to comport with the intent of Congress. This decision is consistent with the conclusions of the First, Second, Third, Fifth, Sixth, Seventh and District of Columbia Circuits. *See Dickstein v. duPont*, 443 F.2d 783, 785 (1st Cir. 1971); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069 (2d Cir. 1972); *Tenney Eng'g, Inc. v.*

19

*United Elec. Radio & Mach. Workers of Am., Local 437*, 207 F.2d 450, 452-53 (3d Cir. 1953); *Rojas*, 87 F.3d at 748; *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 600-01 (6th Cir. 1995); *Miller Brewing Co. v. Brewery Workers Local Union No. 9, AFL-CIO*, 739 F.2d 1159, 1162 (7th Cir. 1984), *cert. denied*, 469 U.S. 1160 (1985); *Cole v. Burns Int'l Sec. Services*, 105 F.3d 1465, 1470-71 (D.C. Cir. 1997). Therefore, the court concludes that the contracts at issue are not excluded from the provisions of the FAA.

## II. Roddrick Jones's EEOC Charge

Plaintiffs make two arguments with regard to the filing of an EEOC charge by Roddrick Jones[10] that included allegations on behalf of a class of African-American employees at UHC. First, plaintiffs assert that the arbitration policy was instituted in retaliation for filing this charge (as well as Ronald Kelly's charge and Lloyd Balfour's charge). Second, plaintiffs assert that because this charge was filed prior to their signing the acknowledgment forms, the arbitration agreement does not apply to the present action. Both arguments are without merit.

Plaintiff Ronald Kelly filed a charge of discrimination with the EEOC on May 25, 1995. (Ex. A to Pls.' Response in Opp. to Defs.' Motion to Stay ("Response in Opp.")). Plaintiff Roddrick Jones filed a charge of discrimination with the EEOC on October 26, 1995. (Ex. B to Pls.' Response in Opp.). Notice of this charge of discrimination was sent to UHC on November 30, 1995. (Ex. D to Pls.' Response in Opp.). Lloyd Balfour filed his charge of discrimination with the EEOC on November 20, 1995. (Ex. C to Pls.' Response in Opp.).

---

[10] Mr. Jones's first name has spelled alternatively "Roddrick" and "Roderick" by the parties. It is spelled "Roderick" in the Amended and Second Amended Complaints, but "Roddrick" in the Third Amended Complaint. The court will use the spelling from this last complaint.

20

None of the plaintiffs has specifically alleged retaliation as giving rise to a cause of action in the present case. In addition, assuming, *arguendo*, that the arbitration policy was implemented in retaliation for Ronald Kelly's filing an EEOC charge, no plaintiff other than Ronald Kelly is in a position to allege retaliation as a result of Mr. Kelly's filing a charge of discrimination. *See Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997) (to establish a prima facie case of retaliation under Title VII, a plaintiff must show that she engaged in "statutorily protected activity") (citation omitted). Furthermore, although Mr. Jones's EEOC charge contains class allegations, this charge was filed and UHC received notice of this charge after they had begun to implement the IDR and arbitration policies.[11] Mr. Balfour's charge was filed after implementation of the policies had begun as well. A claim of retaliation requires a causal relationship between the protected activity and the retaliatory act. *See id.* No causal relationship can exist, however, between protected activity that occurs after the allegedly retaliatory act. Thus, it cannot be said that the implementation of the arbitration policy and the requirement that the arbitration plaintiffs sign the acknowledgment forms was done in retaliation for any action taken by the arbitration plaintiffs or Mr. Jones. Therefore, plaintiffs' retaliation argument fails.

Plaintiff's second argument that Jones's EEOC charge, which included class allegations, forecloses enforcement of the arbitration agreements is equally without merit. As noted above, UHC's Employee Handbook states that the arbitration policy "covers any dispute subject to arbitration which is brought on or after the applicable effective date, even if the alleged act or

---

[11] In October 1995 Mr. Suellentrop sent his initial letter announcing the upcoming policy, and Gerriann Fagan sent her memorandum explaining the policies on November 14, 1995.

omission occurred prior to the applicable effective date." The dispute covered by Jones's EEOC charge became subject to arbitration when this suit was filed and he was added as a party. This suit was filed after the arbitration plaintiffs signed their respective agreements to arbitrate. Thus, the arbitration agreements cover the present lawsuit, and Jones's EEOC charge that included class allegations does not foreclose the stay of this action with respect to the arbitration plaintiffs.

## III. The Validity of the Contracts

Plaintiffs argue that they did not enter into the arbitration agreements in a knowing and voluntary manner, that the agreements were induced by fraud, and that the agreements were contracts of adhesion. Because these assertions are related, the court will consider them together.

As an initial matter, defendants argue that any claims of fraud in the inducement should be decided by the arbitrator and not the court. Having considered the matter, however, the court is of the opinion that it is the proper forum in which this issue should be decided. In *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), the Supreme Court held that,

> if the claim is fraud in the inducement of the arbitration clause itself--an issue which goes to the 'making' of the agreement to arbitrate--the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403-04. In the present case, however, the agreement to arbitrate is the entire contract. The acknowledgment forms specifically state that, "the provisions in this Handbook are guidelines and, except for the provisions of the Employment Arbitration Policy, do not establish a contract or any particular terms or conditions of employment . . . ." Thus, the claim of fraud in the inducement in the present case goes to the making of the arbitration agreement, and the court is the proper forum for the resolution of that claim.

22

Additionally, in *Prima Paint*, the arbitration clause was broad, stating: "Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the rules then obtaining of the American Arbitration Association." *Prima Paint*, 388 U.S. at 398. The Court stated that

> [t]his contractual language is easily broad enough to encompass Prima Paint's claim that both execution and acceleration of the consulting agreement itself were procured by fraud. Indeed, no claim is made that Prima Paint ever intended that "legal" issues relating to the contract be excluded from arbitration, or that it was not entirely free to so contract.

*Id.* at 406.[12] In the present case, however, the arbitration agreement is not so broad. Under the arbitration policy, the parties would be required to submit "all employment related disputes based on a legal claim to arbitration." This language is significantly different from "[a]ny controversy or claim arising out of or relating to this Agreement." As the Supreme Court of Alabama, interpreting *Prima Paint*, has held: "**As long as an arbitration clause is broad enough to encompass claims of fraud in the inducement of the contract in which it is found, any claims as to fraud in the inducement of the contract generally, as opposed to the arbitration agreement specifically, are subject to arbitration.**" *Lorance v. Southern Health Corp.*, 669 So. 2d 890, 892 (Ala. 1995) (emphasis added) (citing *Prima Paint*, 388 U.S. 395) (citation omitted). *See also Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 855 (2d Cir. 1986) (holding that the language "any controversy arising out of or relating to this contract" was "**sufficiently broad** to require arbitration of [the] fraudulent inducement claim") (emphasis added) (citing *Prima Paint*, 388 U.S.

---

[12] The Court did not specifically limit its holding, noted above, to broad arbitration clauses. The language quoted here and the fact that the district court below had focused somewhat on the breadth of the arbitration clause, suggest, however, that the breadth of the agreement is significant.

at 406) (citations omitted). The arbitration clause in the present case is not broad and does not indicate any intent of the parties to submit the question of contract formation to arbitration. Therefore, because the agreement does not contemplate arbitrating issues related to the formation of the contract or the arbitration agreement, the court is of the opinion that it is the proper forum for resolving those issues.

Plaintiffs, on the other hand, argue that they are entitled to a jury trial on the issue of fraudulent inducement, adhesion, and whether they signed the contracts knowingly and voluntarily. Plaintiffs are not entitled to a jury trial on these issues on a motion to stay filed under § 3 of the FAA. While § 4 of the FAA allows for a jury trial on the issue of the making of the arbitration agreement, § 3 does not. Under § 3, a court should stay an action subject to arbitration that is pending before it, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3. Section 4, on the other hand, specifically states, "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." *Id.* § 4. Furthermore, "[w]here such an issue is raised, the party alleged to be in default may . . . demand a jury trial of such issue . . . ." *Id.*

Plaintiffs argue that *Prima Paint* holds that they are entitled to a jury trial under § 3 as well as § 4. In that case, the Court was addressing a motion to stay under § 3. In deciding the question of the arbitrability of a claim of fraud in the inducement, however, the Court looked to the language of § 4, specifically the language of § 4 relating to the "making" of an arbitration agreement. The Court noted that § 4 does not "expressly relate" to a motion for a stay under § 3, but the Court stated that, "it is inconceivable that Congress intended the rule to differ depending upon which party to the arbitration agreement first invokes the assistance of a federal court."

24

*Prima Paint*, 388 U.S. at 404. The Court held, therefore, "that in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Id.*

The plaintiffs' argument that the holding in *Prima Paint* extends the right to a jury trial under § 4 to issues raised under § 3 is without merit. The plain language of § 3 states that the court is to stay the action "upon being satisfied" that the issue involved is referable to arbitration. 9 U.S.C. § 3 (emphasis added). No mention whatsoever is made of a right to a jury trial under § 3. Any determination that the language does include a right to a jury trial would require an expansion of the holding in *Prima Paint*, which this the court refuses to do. *Prima Paint* did not hold that a party is entitled to a jury trial under § 3 where the making of the arbitration agreement itself is in issue. Finally, the plaintiffs have not cited and the court is unaware of any case holding that any party is entitled to a jury trial on a motion to stay under § 3.[13] Thus, the court is of the opinion that the plaintiffs are not entitled to a jury trial on the question of fraudulent inducement, adhesion, or whether they knowingly and voluntarily entered into the arbitration agreements.

---

[13] Plaintiffs cite *T & R Enterprises, Inc. v. Continental Grain Co.*, 613 F.2d 1272, 1278 (5th Cir. 1980), for the proposition that a jury trial is available under 9 U.S.C. § 3. In fact, plaintiffs state that the court held that "in a motion to stay proceedings under § 3 of the FAA, although a right to a jury was available under § 4, party opposing motion failed to demonstrate genuine issues of material fact . . . ." (Pls.' Response Br. of Feb. 24, 1997, at 17 n.24). Plaintiffs neglect to point out that the district court in that case had essentially converted the § 3 motion to stay into a § 4 motion to compel, *see T & R Enterprises*, 613 F.2d at 1274-75, and had ordered the parties to arbitration. *See id.* Thus, the court was concerned with the propriety of a jury trial under § 4 and not merely under § 3, and plaintiffs' reliance on that case is, at best, misplaced.

25

Thus, having determined that the court alone is the proper decision maker for resolving the questions surrounding the making of the arbitration agreements, the court will now turn to those issues.

## A. Fraudulent Inducement

Plaintiffs contend that they were fraudulently induced into signing the acknowledgment forms  because of a number of false representations allegedly made by defendants.  Plaintiffs claim that defendants falsely stated that agreeing to arbitrate was a condition of continued employment while, in fact, employees such as Roddrick Jones continued to work at UHC although they had not signed an acknowledgment form.  Plaintiffs also assert that defendants falsely represented that plaintiffs would not be giving up their rights to pursue employment related claims in a judicial forum by signing the acknowledgment forms.  Furthermore, plaintiffs assert that defendants' representatives fraudulently induced plaintiffs to sign the acknowledgment forms by telling plaintiffs that they were merely acknowledging receipt of the Employee Handbooks and were not expressing any agreement with the contents of the handbook or the acknowledgment form.

To show fraud, plaintiffs must demonstrate that "(1) the defendant[s] made a false representation; (2) concerning a material fact; (3) upon which the plaintiff[s] reasonably relied; and (4) as a proximate result of such reliance, the plaintiff[s] suffered damages." *Intercorp., Inc. v. Pennzoil Co.*, 877 F.2d 1524, 1534 (11th Cir. 1989) (citing *Smith v. Reynolds Metals Co.*, 497 So. 2d 93, 95 (Ala. 1986)); *accord Harris v. M & S Toyota, Inc.*, 575 So. 2d 74, 76 (Ala. 1991); Ala. Code § 6-5-101 (1993).  The misrepresentation is actionable if it was made intentionally,

26

recklessly or innocently by mistake. *Jewell v. Seaboard Industrial, Inc.*, 667 So. 2d 653, 657 (Ala. 1995); Ala. Code § 6-5-101.

With regard to plaintiffs' first argument that agreeing to arbitrate was not a requirement for continued employment, defendants challenge the falsity of this statement. Defendants assert that agreeing to arbitrate was and is a condition of employment and that legitimate reasons for not having signed the agreements exist for those employees who have not signed the acknowledgment forms.[14] For example, plaintiffs assert that Roddrick Jones was not required to sign an agreement to arbitrate, but defendants counter that Jones already had filed an EEOC charge by the time that the arbitration policy was implemented. Defendants need not subject themselves to a retaliation claim by firing Roddrick Jones in order to demonstrate that agreeing to arbitrate is a condition of continued employment. Thus, the fact that Jones has not signed an acknowledgment form and is still employed by defendants does not make the statement that one must agree to arbitrate in order to remain employed necessarily false. In fact, the court is satisfied that the statement that employees must agree to arbitrate as a condition of continued employment was not false.[15]

---

[14] Although no evidence has been submitted, in a letter to the court written after oral argument on the motion to stay, defense counsel explained that of 528 employees of defendants in Birmingham, Alabama, eight employees have not signed forms "recognizing arbitration as the exclusive and final forum for employee disputes." (Defs.' Ltr. to the Court of March 5, 1997). Two of the eight signed the acknowledgment form but made comments that will require defendants "to revisit the issue with them." One of the eight is Roddrick Jones, discussed below. Two more of the eight received communications in connection with transfers that established their obligation to arbitrate employment disputes. Defendants expect to contact the remaining three employees to obtain their signatures on acknowledgment forms or otherwise apprise them of their obligation to arbitrate certain claims.

[15] Plaintiffs argue that the existence of an unannounced company policy regarding those employees who refuse to sign the acknowledgment form somehow proves that a misrepresentation was made with regard to an agreement to arbitrate being required for continued employment. As

27

Plaintiffs next contend that defendants misrepresented the nature of the acknowledgment form and the consequences of plaintiffs' signing the form. Specifically, plaintiffs assert that defendants falsely represented that plaintiffs' agreement to arbitrate would not foreclose their access to a judicial forum and that defendants falsely represented that in signing the acknowledgment forms plaintiffs were merely indicating their receipt of the employee handbooks and not necessarily agreeing with or to the contents thereof. As will be discussed below, plaintiffs' arguments do not relieve them of their obligation to arbitrate their claims.

As noted above, to prove fraudulent inducement, plaintiffs must show, inter alia, reasonable reliance on a misrepresentation of material fact. Here, assuming that the defendants made the statements in question and that they were false (and they appear to be), plaintiffs' reliance on the statements at issue was not reasonable. The acknowledgment forms that plaintiffs signed made it clear that arbitration was the exclusive method by which they could resolve employment discrimination claims, and plaintiffs' assertions that they believed otherwise are unreasonable. The second sentence on the forms stated, "I understand that these documents contain important information . . . on my obligations as an employee." The arbitration clause on the form was at the top of the signature page. This clause stated, "I understand that arbitration is the **final, exclusive and required forum for the resolution of all employment related disputes** which are based on a legal claim." In light of this language, plaintiffs cannot complain that they thought they were merely acknowledging receipt of the employee handbook and that their

---

defendants' counsel explained at oral argument, however, the policy is for a human resources representative to discuss the contents of the Employee Handbook and explain to the person refusing to sign that by continuing to be employed by defendants the person is agreeing to arbitrate employment claims. (*See* Evesque Dep. at 128).

28

access to a judicial forum was not being foreclosed. The language was clear and understandable and was not buried in a multi-page document where the plaintiffs would be unaware of or unable to find it. *See Coleman v. Prudential Bache Securities, Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986) (per curiam) (while addressing an argument that an arbitration clause was in a contract of adhesion, stating that "absent a showing of fraud or mental incompetence, a person who signs a contract cannot avoid her obligations under it by showing that she did not read what she signed"); *LeFoy v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. CV 89-PT-0296-E, 1989 WL 80444, at *3 (N.D. Ala. April 14, 1989) (holding that claims of fraud in the inducement, duress, and others, did not "obviate the arbitration agreement" because "plaintiff cannot avoid the arbitration agreement by claiming he did not read it before signing") (citing *Coleman*, 802 F.2d at 1352). *See also Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 980 (2d Cir. 1996) (holding that defendants failed to prove they were defrauded into agreeing to arbitrate where "clauses were not camouflaged, and Defendants cannot now complain that they failed to read or inquire into the meaning of those documents") (citations omitted); *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 288 (9th Cir. 1988) (stating that "[w]hether the [plaintiffs] read the agreement but did not notice the arbitration clause, or chose not to read the agreement at all, their reliance on [defendant's] alleged misrepresentation was unreasonable in light of the clear and explicit language of the contract"); *Stripling v. Southtrust Bank, N.A.*, No. 1951901, 1997 WL 127222, *2 (Ala. March 21, 1997) (holding that even though plaintiffs did not read the contracts before signing, "ordinarily when a competent adult, having the ability to read and understand an instrument, signs a contract, he will be held to be on notice of all the provisions contained in that contract and will be bound thereby") (citation omitted). The court is satisfied that all the arbitration plaintiffs had

29

an opportunity to read the acknowledgment forms before they signed them.[16] Further, had the plaintiffs done so, they would have realized the nature of their agreement to arbitrate. Plaintiffs cannot rely on their alleged failure to read the forms as a means of avoiding their contract to arbitrate employment claims.

The court has reviewed the facts surrounding each misrepresentation alleged to have been made by defendants, and the overall facts surrounding the introduction and implementation of the arbitration policy. Without rehashing all the facts outlined above, the court is of the opinion that plaintiffs have not produced sufficient evidence of any material misrepresentation made to any of the arbitration plaintiffs on which they might have reasonably relied. For example, no arbitration plaintiff denies that he or she received the memorandum from Gerriann Fagan outlining the upcoming arbitration policy. Additionally, no arbitration plaintiff has asserted that he or she received the allegedly false "e-mail" from Wendy Evesque or that he or she relied on that e-mail in deciding whether or not to sign the acknowledgment form. Defendants, on the other hand, have shown that no arbitration plaintiff was the intended recipient of that e-mail and that none of the arbitration plaintiffs is in the Network Services Department (the department to which Ms. Evesque sent the e-mail).[17] Furthermore, no arbitration plaintiff was privy to Lloyd Balfour's

---

[16] Assuming, without deciding, that the plaintiffs had only one hour to read and sign the forms, as some of them have claimed, they still had sufficient time to read and understand a two page document. The fact that the plaintiffs did not take advantage of that opportunity will not help them now.

[17] It is also worth noting that although Ms. Evesque's e-mail is inartfully worded and ambiguous, it is not necessarily misleading as to a material fact. The e-mail states that defendants "do expect, as a condition of employment, that employees will go through this process to resolve disputes." Furthermore, in light of the plain language on the acknowledgment form that arbitration is the exclusive method of resolving employment claims, even if the arbitration plaintiffs had received

30

addendum to his signing of the acknowledgment form, and no arbitration plaintiff has asserted that Wendy Evesque left them with the same understanding as she apparently left Mr. Balfour. Thus, the court is of the opinion that no material misrepresentation sufficient to support a claim of fraudulent inducement with respect to the arbitration policy was made to any arbitration plaintiff.

## B. Adhesion

Plaintiffs also raise the standard objection that the arbitration agreements are contracts of adhesion. Plaintiffs argue that defendants right to alter, amend or revoke the policy at any time make the contract adhesive and unconscionable. Furthermore, plaintiffs contend that the arbitration clauses were offered on a "take it or leave it" basis due to the unequal bargaining power between plaintiffs and defendants. Finally, plaintiffs allege that they were not given sufficient time to review to policy before signing it. Thus, plaintiffs contend that they should not be bound by the agreements to arbitrate.

The court is of the opinion that assuming *arguendo* that the arbitration agreements are adhesive[18]--i.e., that they were offered on a take it or leave it basis with no opportunity for bargaining on the part of the plaintiffs--the agreements to arbitrate are nonetheless valid and enforceable. First, as the Eleventh Circuit stated in *Coleman*, "there is nothing inherently unfair or oppressive about arbitration clauses." 802 F.2d at 1352. In fact, as the court has noted above, the FAA shows a strong federal policy in favor of arbitration. *See Moses H. Cone*, 460 U.S. at

---

Ms. Evesque's e-mail, reliance on that message would not have been reasonable.

[18] The court is not convinced that the agreements are adhesive. Nonetheless, because the arbitration policy was a mandatory condition of employment, an employee's choice was to accept the agreement to arbitrate employment disputes or discontinue his or her employment with defendants. Thus, the court will assume that the agreements were adhesive.

31

24. Second, nothing about the present agreement is unconscionable or overbearing. It simply requires the plaintiffs to submit their employment claims to arbitration rather than sue in court. In light of the strong federal policy in favor of arbitration, this agreement is not unconscionable. Furthermore, as noted above, the plaintiffs were given sufficient time to review the acknowledgment form before they were asked to sign it. Plaintiffs cannot be heard to complain now about agreements that they admittedly did not read at the time they signed. As the court held in *Coleman*, absent a showing of fraud or incompetence, one who signs an agreement cannot avoid his or her obligations under that agreement by arguing that he or she did not read what he or she signed. 802 F.2d at 1352.

## C. Knowing and Voluntary

Plaintiffs argue that they did not enter into the agreements to arbitrate in a knowing and voluntary manner and that, therefore, the agreements are unenforceable. Plaintiffs' argument is without merit. The plaintiffs contend that the defendants have a heavy burden to prove that their agreements to arbitrate were signed knowingly and voluntarily because the agreements involved the waiver of a substantive right. Plaintiffs acknowledge the futility of their argument, however, when they note that the Supreme Court has held that in agreeing to arbitrate a statutory claim, "a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). Thus, plaintiffs agreements to arbitrate do not involve the waiver of a substantive right, and the knowing and voluntary standard applied in the cases cited by plaintiffs is not applicable to the present action. *See, e.g., Puentes v. United Parcel Service Inc.*, 86 F.3d

32

196, 198 (11th Cir. 1996) (considering whether employee's release of employer from all liability under Title VII and 42 U.S.C. § 1981 was knowing and voluntary); *Gonzalez v. County of Hidalgo, Texas*, 489 F.2d 1043, 1046-47 (5th Cir. 1973) (considering the contractual waiver of a constitutional right).[19] The present action does not involve the release of liability. Rather, it involves an agreement to arbitrate employment claims instead of pursuing those claims in a court of law.[20] In addition, plaintiffs were informed of the arbitration policy and had an opportunity to read the acknowledgment forms prior to signing them. In that sense, the plaintiffs entered into the arbitration agreements voluntarily, but defendants need not meet the heavy burden argued by

---

[19] The other cases cited by plaintiffs are equally inapposite. In *Prudential Ins. Co. v. Lai*, 42 F.3d 1299 (9th Cir. 1994) *cert. denied*, 116 S. Ct. 61 (1995), for example, the court reversed an order compelling arbitration of sexual harassment and discrimination claims because the plaintiffs "did not knowingly enter into any agreement to arbitrate employment disputes." *Id.* at 1301. The plaintiffs had signed "Standard Applications for Securities Industry Registration ("U-4 forms") that included a provision that they agree "'to arbitrate any dispute, claim or controversy that . . . is required to be arbitrated under the rules, constitutions, or bylaws of the organizations with which I register.'" *Id.* (alteration in original). Plaintiffs then registered with the NASD, which requires its members to arbitrate disputes "arising in connection with the business" of its members. *Id.* It was the NASD form that made plaintiffs' claims potentially arbitrable, *id.* at 1302, but plaintiffs never received and did not have an opportunity to read the NASD manual that included the arbitration clause before signing the NASD form. *Id.* at 1303. The court concluded:

> In this case, even assuming that appellants [plaintiffs] were aware of the nature of the U-4 form, they could not have understood that in signing it, they were agreeing to arbitrate sexual discrimination suits. The U-4 form did not purport to describe the types of disputes that were to be subject to arbitration. Moreover, even if appellants had signed a contract containing the NASD arbitration clause, it would not put them on notice that they were bound to arbitrate Title VII claims. That provision did not even refer to employment disputes.

*Id.* at 1305. The present case, however, has significantly different facts. The agreements plaintiffs signed clearly stated that they would be required to arbitrate all employment disputes based on a legal claim. Plaintiffs cannot complain now that they were unaware of the provisions of the agreement that they signed when the provisions were clearly stated for them to read.

[20] Plaintiff's argument that these are "forum selection" clauses also misses the mark. Plaintiffs signed agreements to arbitrate, not agreements to have a trial in New York rather than Alabama, for example.

plaintiffs. Again, plaintiffs failure to read what they signed does not insulate them from the obligations of their bargain, and they must abide by the provisions of the arbitration policy. *See Coleman*, 802 F.2d at 1352.

## IV. Mutuality of Obligation

Finally, plaintiffs contend that the arbitration agreements lack mutuality of obligation and are, therefore, invalid and unenforceable as a matter of law. Plaintiffs argue that the arbitration agreements lack mutuality of obligation because defendants' reservation of the right to alter, amend or revoke the arbitration policy at any time with or without notice relieves plaintiffs of any obligation to arbitrate employment related claims. Plaintiffs' argument is incorrect. Although defendants have reserved the right to alter, amend or revoke the arbitration policy, it is not necessary that the arbitration agreements contain "mutuality of obligation," as that term is understood by the plaintiffs, for the agreements to be enforceable.[21]

Plaintiffs rely primarily on two cases to support their argument. The first is *Hull v. Norcom, Inc.*, 750 F.2d 1547 (11th Cir. 1985). In that case, the Eleventh Circuit held that the requirement for a binding agreement is consideration, not "mutuality of obligation." *Id.* at 1550. The court went on to hold, however, that, "the consideration exchanged for one party's promise to arbitrate must be the other party's promise to arbitrate at least some specified class of claims." *Id.* The Eleventh Circuit's holding in *Hull* has been criticized and is largely limited to now overruled New York law. *See Latifi v. Sousa*, No. CV-95-H-2136-NE, 1996 WL 735260, at *4-5

---

[21] This discussion assumes, *arguendo*, that the agreements do lack mutuality of obligation. It is not obvious to the court that the defendants are not obligated to arbitrate employment disputes unless and until the policy is amended in some way. Because the court need not decide this issue, however, the court will not address it further.

(N.D. Ala. Dec. 23, 1996) (noting that *Hull* has been rejected by most courts as unique to New York law and that the doctrine in *Hull* has now been overruled by New York courts, as well); *W.L. Jordan & Co. v. Blythe Industries, Inc.*, 702 F. Supp. 282, 284 (N.D. Ga. 1988) (declining to follow *Hull* because it was decided under New York law). Thus, *Hull* is not relevant in the present action involving contracts to which New York law has no application.

Plaintiffs also rely on *Northcom, Ltd. v. R.E. James*, No. 1941697, 1997 WL 7715 (Ala. Jan. 10, 1997), in which the Supreme Court of Alabama held that mutuality of obligation is required for an arbitration agreement to be valid under Alabama law. *Id.* at *4-5. The court is of the opinion that *Northcom* was decided under contract principles that reflect a distrust of arbitration and are aimed specifically at arbitration agreements. Because the propriety of an arbitration agreement is to be determined under general contract principles, the court declines to follow *Northcom*.

*Northcom* relied heavily on *Hull* and did not consider the holding of *Hull* to be improper or inapplicable. 1997 WL 7715, at *3. Furthermore, as the dissent pointed out, the majority confused "mutuality of consideration" with "mutuality of remedies" and thereby expanded the requirements for a valid contract under Alabama law. *Id.* at *5 (Maddox, J., dissenting). As Chief Justice Hooper also noted, the "majority's requirement of mutuality of remedies creates an entirely new animal in the history of Alabama contract law." *Id.* (Hooper, C.J., dissenting). A valid contract requires "agreement, consideration, two or more contracting parties, legal object, and capacity." *Id.* (Hooper, C.J., dissenting) (citing *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297 (Ala. 1986). The Alabama Supreme Court had previously held that "[a] contract, lacking in mutuality, is unenforceable, because there is an absence of consideration moving from

35

one party to the other, but when the promise of each party is legally sufficient consideration for the other's promise, there is no lack of mutuality." *Marcrum v. Embry*, 282 So. 2d 49, 51 (Ala. 1973) (citations omitted). The court went on to state:

> [M]utuality in a contract does not mean equal rights under the contract, or that each party is entitled to the same rights or covenants under the contract. **So long as there is a valuable consideration moving from one side to the other, or there are binding promises on the part of each party to the other, there is adequate consideration for a valid contract.**

*Id.* (emphasis added). *See also* Restatement (Second) of Contracts § 79 (1981) ("If the requirement of consideration is met, there is no additional requirement of . . . 'mutuality of obligation'"). As will be discussed below, both sides gave consideration for the arbitration agreements. Thus, mutuality is not lacking in the arbitration agreements, and they are valid contracts.

Plaintiffs argue that *Northcom* reflects the current state of Alabama law and that defendants must live with that fact. As defendants point out, however, *Northcom* does not reflect the healthy regard for the federal policy favoring arbitration required by the FAA. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability"); *Kidd v. Equitable Life Assurance Soc'y*, 32 F.3d 516, 519 (11th Cir. 1994) (citing *Moses H. Cone*, 460 U.S. at 24-25). As the United States Supreme Court has held, under § 2 of the FAA, an agreement to arbitrate "is valid, irrevocable, and enforceable, *as a matter of federal law* 'save upon such grounds as exist

at law or equity for the revocation of any contract.'" *Perry v. Thomas*, 482 U.S. 483, 492 n.9

(1987). The court noted further:

> Thus, state law, whether of legislative or judicial origin, is applicable *if* that law
> arose to govern issues concerning the validity, revocability, and enforceability of
> contracts generally. A state-law principle that takes its meaning precisely from the
> fact that a contract to arbitrate is at issue does not comport with this requirement
> of § 2. A court may not, then, in assessing the rights of litigants to enforce an
> arbitration agreement, construe that agreement in a manner different from that in
> which it otherwise construes nonarbitration agreements under state law.

*Id.* (citations omitted). The Alabama Supreme Court has added a requirement of "mutuality of

obligation" to arbitration agreements that does not exist for all other contracts formed under

Alabama law. This requirement, therefore, does not comport with the commands of § 2 and is

not to be considered in determining the validity of the present agreements to arbitrate. As noted

above, defendants need only show that the agreements are supported by consideration, not

"mutuality of obligation."

The requirement of consideration has been met in the present case.[22] Consideration for a

promise may come in the form of "an act, a forbearance, a detriment, or a destruction of a legal

right, or a return promise, bargained for and given in exchange for the promise." *Kelsoe v.*

*International Wood Products, Inc.*, 588 So. 2d 877, 878 (Ala. 1991) (citations omitted). The

consideration given by the plaintiffs was their promise to arbitrate employment disputes.

Defendants gave consideration in continuing to employ the plaintiffs in exchange for their signing

the arbitration agreements. The defendants had the option of firing any employee at any time for

---

[22] Plaintiffs do not challenge the existence of consideration in the agreements in question.
Rather, plaintiffs argue that there must be mutuality of obligation in addition to consideration for the
present agreements to be enforceable. As noted above, the court rejects this argument.

any legal reason. They did not terminate those employees that agreed to arbitrate. One can view this as defendants' performing an act (continuing to employ the plaintiffs) or making a promise ("we promise not to fire you on the spot if you sign this agreement") and performing that promise immediately. Either way it was consideration for the plaintiffs' promises.

Therefore, the court is of the opinion that the arbitration agreements at issue were binding contracts. Assuming that they do not contain "mutuality of obligation," the court is of the opinion that such mutuality is not required for a valid arbitration agreement to exist. All that is required is consideration. Because the agreements do not lack consideration, they are enforceable contracts.

## CONCLUSION

The arbitration plaintiffs have entered into valid, enforceable written agreements to arbitrate the employment discrimination claims alleged by them. The court is of the opinion, therefore, that under § 3 of the FAA, defendants' Motion to Stay is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this ___ day of May, 1997.

**SHARON LOVELACE BLACKBURN**
United States District Judge