FILED

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA99 MAR 29 AM II: 15
## SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **RONALD KELLY, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **CASE NUMBER: CV 96-B-1047-S** |
| | ) |
| **UHC MANAGEMENT COMPANY, INC.,** | ) |
| **a Corporation, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

ENTERED

MAR 2 9 1999

## MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment on the Claims of

Roddrick Jones filed by defendants UHC Management Company, Inc., United HealthCare Corp.,

and United HealthCare South, Inc. (collectively referred to as "United"). The plaintiffs[1] alleged

race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e

et seq. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). Roddrick Jones ("Jones") alleges

that he was discriminated against with respect to three promotions, that he was retaliated against

as a result of his EEOC charge and complaints of alleged racial discrimination and that he was

subject to a racially hostile working environment. Upon consideration of the record, the

submissions of both parties, the argument of counsel, and the relevant law, the court is of the

---

[1]     This suit at one time involved sixteen plaintiffs including former employees, current
employees, and an applicant of United. The claims of eleven of the plaintiffs have been stayed
under the Federal Arbitration Act pursuant to this court's May 9, 1997, Order. *Kelly v. UHC
Management Company, Inc.*, 967 F. Supp. 1240 (N.D. Ala. 1997). In addition, the claims of
Cecelia Bryant were dismissed for her failure to comply with discovery. The claims of Tomeka
Felder were dismissed by stipulation of the parties. This opinion addresses only the claims of
Roddrick Jones.



opinion that United's motion is due to be granted.

## I. FACTUAL SUMMARY

United hired Jones as a Technical Support Specialist in the Network Services Department in August of 1994. (Jones Dep. at 17-18, 26). Nancy Musgrove, Network Services Manager, made the decision to hire Jones as a Technical Support Specialist and had managerial authority over Jones. (Musgrove Aff. ¶ 7; Jones Dep. at 27, 33). Jones worked as a Technical Support Specialist in the Network Services Department until December 15, 1995. (Jones Dep. at 31).

In the summer of 1995, Nancy Musgrove reorganized the Network Services Department, which resulted in the filling of two positions: Service and Support Coordinator and Network Administrator (also referred to as LAN/WAN Administrator). (Second Musgrove Aff. ¶ 2)[2]. In July of 1995, Musgrove selected John McGough for the Service and Support Coordinator position. (Musgrove Aff. ¶¶ 34-35). The Service and Support Coordinator position was not posted. Musgrove and Senior Human Resources Representative, Wendy Evesque, testified that it was pointless to post the Service and Support Coordinator position because they concluded that McGough was clearly the best qualified employee in the department to fill the position. (Musgrove Aff. ¶ 36; Evesque Aff. ¶ 5; Jones Dep. at 206). Prior to McGough's selection for the Service and Support Coordinator position, McGough was a Technical Support Specialist, and had trained Jones as a Technical Support Specialist. (McGough Aff. ¶¶ 2-3; Musgrove Dep. at 71). Except for the supervisory function associated with the Service and Support Coordinator position, McGough had been performing all of the job duties associated with the Service and Support Coordinator position

---

[2]Nancy Musgrove signed two affidavits in regard to the claims of Roddrick Jones. One affidavit is dated August 13, 1997 (hereinafter "Musgrove Aff.") and the second is dated October 20, 1997 (hereinafter "Second Musgrove Aff.).

prior to his promotion to the position. (McGough Aff. ¶ 3; Musgrove Aff. ¶ 35). Musgrove stated in her affidavit that she selected McGough for the following reasons: (1) McGough was the only United employee who satisfied the one year tenure rule; (2) McGough had extensive troubleshooting experience; (3) he was available to work overtime when necessary; (4) he had experience performing all the functions of the position; (5) he had trained the Technical Support Specialists; and (6) he had been satisfactorily performing the duties associated with the Service and Support position, except for the supervisory functions. (Musgrove Aff. ¶¶ 34-36; Musgrove Dep. at 26-29).

In July of 1995, Musgrove selected Mike Roy, a white male, for the Network Administrator position. (Second Musgrove Aff. ¶ 2). The Network Administrator position was not posted. (Jones Dep. at 209, 218). The most important qualifications for the Network Administrator position were Network experience, troubleshooting experience, Novell experience (with Novell certification preferred), hardware experience with servers, "token ring" network topology experience focusing on setting up Networks and converting Network workstations, and the employee's availability and willingness to work all hours necessary to maintain United's network computer system. (Musgrove Aff. ¶ 15; Second Musgrove Aff. ¶ 3). Musgrove testified in her affidavit that the reasons why she selected Mike Roy over Jones are as follows: (1) Jones was not qualified to apply for the position because he had not previously worked for United for one year and United requires, with certain exceptions, that employees hold a position for at least one year before they are eligible to apply for another position; (2) Roy demonstrated excellent job performance and had superior experience with United's network computer system; (3) Roy had more experience in Novell network applications than any other employee working in technical support; (4) Roy had Novell experience and was a certified Novell reseller and trainer; (5) Roy had been trained in token ring connectivity, which was United's

3

network topology; (6) Roy was highly experienced in Novell operating systems and Novell networking; (7) Jones did not have the equivalent Novell experience; (8) Jones did not have the requisite knowledge of Novell networking to perform the Network Administrator position; (9) Jones did not have the token ring training; and (10) Roy's training and experience was tailored towards Novell networking, while Jones's training and experience was more in the area of mainframes and workstations. (Second Musgrove Aff. ¶ 5).

Roy voluntarily resigned from United in August of 1995 and the Network Administrator position was posted as vacant. (Second Musgrove Aff. ¶ 6). In August of 1995, Jones learned through that e-mail job posting that there was an opening in the Network Administrator position and Jones applied for the position. (Jones Dep. at 34-35, Defs' Exh. 2).

A total of forty-eight people applied for the Network Administrator position. (Musgrove Aff. ¶ 22). Nancy Musgrove was the hiring supervisor for the Network Administrator position. (Musgrove Aff. ¶ 25; Jones Dep. at 72-73). Six applicants were interviewed for the position. Jones was not one of the persons interviewed for the position. (Musgrove Aff. ¶¶ 20, 22). Musgrove testified in her affidavit that she decided not to interview Jones for the Network Administrator position because, in Musgrove's judgment, Jones lacked the basic technical skills required for the job, had virtually no network administration and network troubleshooting experience, showed little initiative, failed to make use of the computer training provided to him by United, and had difficulty completing routine assignments. (Musgrove Aff. ¶ 11, 19-20). Musgrove further stated that Jones's work experience focused primarily on computers in a mainframe environment, as opposed to a network environment, and that Jones was not a suitable candidate because Jones was working a second job at nights and previously had informed her that he would need plenty of advance notice

4

before he could be available to work overtime. (Musgrove Aff. ¶¶ 20- 21).

Musgrove selected Jimmy Hamilton, a white male, for the Network Administrator position. (Jones Dep. at 72-73; Musgrove Aff.¶ 25). Musgrove testified in her affidavit that she selected Hamilton because he was a Certified Novell Administrator, he had four years experience working directly with computer networks, he had cabletron hubs experience, he had experience working with CISCO routers which United was planning to install, he had experience working with T-1 connections, he had experience working with Novell network applications, he had supervisory experience, and he had an excellent understanding of LAN/WAN networks. (Musgrove Aff. ¶ 26). Musgrove further based her decision to hire Hamilton on the fact that Hamilton had previously assisted AmSouth Bank relocate its network computer department to a new building and Musgrove believed that experience would prove beneficial to United, as United planned to move from its Southside location to a new Colonnade location in late 1995. (Musgrove Aff. ¶¶ 17, 26).

Jones alleges that Musgrove treated him in a more harsh manner than the white employees she supervised. Jones claims that Musgrove told him that she did not want him to shine as an individual in the department. (Jones Dep. at 58) Jones stated that Musgrove once replaced him from being in charge of a project for no apparent reason, refused to let him fill in for McGough when McGough was absent, and had him paged when she noticed his truck was not in the parking lot. (*Id.* at 119-20, 129-32). He denied telling Musgrove that he worked a second job at night. (Jones Aff. ¶ 3). Jones also points to positive job evaluations he received from Musgrove in November of 1994 and to performance and merit pay increases he earned in May and July of 1995 as evidence that Musgrove's criticisms of his work were unfounded.

5

In September and October of 1995, Jones complained about alleged racial discrimination in promotions to United's Human Resources Director, Gerriann Fagan, to United's CEO, Bob Suellentrop, and to United's COO, Bob Yungk. (Jones Dep. at 69-70, 149-153, 165-166, 181; Fagan Dep. at 34-35, 43-45, 199-203). Jones alleges that during one of his meetings with Suellentrop to discuss black employees and promotions, Suellentrop stated that perhaps the reason black employees were not getting promotions was because they lacked proper interviewing techniques. (Jones Dep. at 146-47). On December 5 or 6, 1995, Gerriann Fagan received Jones's November 3, 1995, EEOC charge alleging racial discrimination. (Fagan Dep. at 286; Pl.'s Evid. Submission, Tab 15). Fagan forwarded the charge to Bob Suellentrop.[3] (Fagan Dep. at. 287-89).

In October of 1995, Jones learned that a co-worker, IMAX Administrator Christa Mayfield, a white female, had stored a "personal" document in a personal directory (labeled "CHRISTA") on United's network computer system. (Jones Dep. at 138-39). Jones alleges that he learned about the document from his supervisor, John McGough, who denies the allegation. ( McGough Aff. ¶¶ 9-10). Shortly after learning of Ms. Mayfield's personal document, Jones told another co-worker, Help Desk Operator Kelly Warren, a white female, about Ms. Mayfield's document. (Jones Dep. at 139-140; Musgrove Dep. at 108, 120). Jones told Ms. Warren exactly how to find Ms. Mayfield's personal document on the network. (Chapple Aff. ¶ 6; Musgrove Dep. at 120). Jones and Warren, by virtue of their jobs as computer technicians, had special access to all employee computer files at United. (Musgrove Aff. ¶ 44; Musgrove Dep. at 98-99). With Jones looking on, Warren printed off a copy of Christa Mayfield's "personal" document. (Jones Dep. at 140-41; Musgrove Dep. at 102-103,

_____

[3]    Jones filed a second charge with the EEOC on December 7, 1995, alleging retaliation. (Pl.'s Evid. Submission, Tab 17).

6

108). Help Desk Operator Jeannie Chapple, a white female, saw Jones and Warren access Christa Mayfield's director and print off the personal document. (Chapple Aff. ¶ 6).

Jones and Warren searched Ms. Mayfield's "CHRISTA" directory in an effort to find more personal documents. (Jones Dep. at 140; Chapple Aff. ¶ 6). They succeeded in locating a second personal document, which dealt with a beauty pageant. (*Id.*). Ms. Warren printed off the personal document with Jones looking on.[4] (Chapple Aff. ¶ 6; Jones Dep. at 141; Musgrove Dep. at 92-98). Jones took the Christa Mayfield documents from Kelly Warren after they were printed. (Jones Dep. at 141). Warren and Chapple advised Jones to give the documents to Nancy Musgrove. (Jones Dep. at 141; Chapple Aff. ¶ 7). Jones never gave the documents to Nancy Musgrove, but kept them so that he could use them in the future as evidence that black and white employees who use United's computer system for personal use receive different discipline for the same offense. (Jones Dep. at 141-142, 144). Jones alleges that John McGough, his supervisor, told him not to give the personal documents to Musgrove. (Jones Dep. at 139-141).

On November 10, 1995, Jones wrote a letter to Robert J. Backes, United's Vice President of Human Resources, whose office is in Minneapolis, Minnesota. (Fagan Dep. at 270; Pl.'s Evid. Submission, Tab 13). In that letter, Jones accused United's Birmingham, Alabama office of racial discrimination against black employees, and he enclosed with that letter copies of the Christa Mayfield documents he and Warren had printed off the computer system. (Jones Dep. at 142). United first learned that Jones and Warren had accessed Christa Mayfield's personal computer files when Backes received Jones's November 15, 1995, letter. (Musgrove Aff. ¶ 41; Fagan Dep. at 309). United

---

[4]The "personal" documents Jones and Kelly Warren obtained from Christa Mayfield's computer directory related to Ms. Mayfield's sexual orientation. (Musgrove Aff. ¶ 50).

7

commenced an investigation into Jones's and Warren's accessing and printing of Christa Mayfield's personal computer directory. (Fagan Dep. at 311-315; Musgrove Aff. ¶ 42). Musgrove was instructed to investigate and determine how Jones came into possession of Christa Mayfield's personal documents. (Musgrove Dep. at 98, 122).

Jones admitted his involvement in the searching for and printing of Christa Mayfield's personal documents. (Fagan Dep. at 298, 316; Musgrove Dep. at 127). United concluded that Jones and Warren acted in violation of United's policies by accessing Christa Mayfield's personal computer directory and printing off her personal documents. (Musgrove. Aff. ¶¶ 54-55; Jones Dep. at 193; Fagan Dep. at 294; Musgrove Dep. at 126-127, 130-131). United also considered that Jones acted inappropriately by failing to give the documents to a supervisor or manager immediately, but instead keeping them for over a month. (Fagan Dep. at 315-320). United concluded that Jeannie Chapple had been present when Jones and Warren accessed Christa Mayfield's files and that Chapple should have informed a supervisor of the existence of the documents. (Musgrove Aff. ¶ 55).

United's Employee Handbook contains a section on "Work Conduct and Discipline," which lists various examples of offenses which can result in "immediate termination." Included in that list are "breach of confidentiality relating to employer, employee, customer, or provider information" and "violations of any of UHC's employment policies including but not limited to confidentiality, security, solicitation, insider trading, conflict of interest, and code of conduct." (Handbook at A3-9, Tab 7 attached to Defs' Notice of Filing Additional Evid. Materials in Support of Summ. J. on the Claims of Roddrick Jones). United's "Information Security" policy states that "Employees are responsible for: ... reporting questionable activities regarding the misuse of UHC's information resources to their supervisor/manager, HRR or the appropriate security area (i.e., Corporate Audit, Information

8

Systems.)" (*Id.* at B2-5).

Chapple was given a written warning, which was placed in her permanent personnel file at United. (Musgrove Aff. ¶ 55; Musgrove Dep. at 116). Christa Mayfield received a written warning because she stored personal documents on United's network. (Musgrove Dep. at 112). Musgrove believed that Jones and Warren should be terminated for their conduct, but CEO Bob Suellentrop overruled her recommendation and decided instead to suspend Jones and Warren for three days without pay, and each was transferred out of United's Network Service Department. (Jones Dep. at 135, 187, 192, 196; Musgrove Dep. at 116, 125-126; Fagan Dep. at 294-299; Musgrove Aff. ¶ 56).

In support of his claims of retaliation and hostile work environment, Jones alleges that (1) he was instructed by his supervisor, John McGough, that he should inform McGough of Jones's whereabouts after Musgrove inquired as to where Jones was one day when Jones was missing; (2) he did not receive a "star" in an employee recognition program called "Shoot for the Stars"; and (3) he was not approved for Novell "CNE" training while other employees were. (Musgrove Aff. ¶¶ 70-72, 76, 80, 82; McGough Aff. ¶¶ 17-18, 23; Jones Dep. at 129-131, 592; McGough Dep. at 92-96, 98).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*,

9

398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)

## III. DISCUSSION

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e-2(a)(1). A plaintiff alleging illegal discrimination under Title VII[5] may establish a genuine dispute as to his claim in three ways: 1) by presenting direct evidence of discriminatory intent, *see Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998) (direct evidence defined as "evidence,

---

[5]Where a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under Section 1981, the legal elements of the claims are the same and thus the claims need not be discussed separately. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985).

10

which if believed, proves existence of fact in issue without inference or presumption"); 2) by meeting the three-step test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or 3) by demonstrating through statistics a pattern of discrimination, *see Carter*, 132 F.3d at 642 n.5 (citing *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984)).

Since plaintiff presents no direct or statistical evidence of discrimination, he must rely on the *McDonnell Douglas* burden shifting analysis. Under the *McDonnell Douglas* framework, the plaintiff first "must establish a prima facie case of discrimination. The employer then must respond with a legitimate, nondiscriminatory reason for its actions. In order to prevail, the plaintiff must establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998), (citing *Walker v. NationsBank of Fla. N.A.* 53 F.3d 1548, 1556 (11th Cir. 1995)). Despite the burden shifts in the *McDonnell Douglas* test, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997).

## A. Promotion Claims

In order to demonstrate a prima facie case for discriminatory failure to promote, a plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for and applied for the promotion; 3) he was rejected in spite of his qualifications; and 4) the individual who received the promotion is not in a protected group and had lesser or equal qualifications. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998).

11

### 1. Service and Support Coordinator Position

Although United contends that Jones was not qualified for the position, the court will assume that Jones has established a prima facie case with respect to the Service and Support Coordinator position filled by John McGough.[6] United has articulated legitimate, non-discriminatory reasons for Musgrove's selection of McGough. Prior to McGough's selection for the Service and Support Coordinator position, McGough was a Technical Support Specialist, and had trained Jones as a Technical Support Specialist. Except for the supervisory functions associated with the Service and Support Coordinator position, McGough had been performing all of the job duties associated with the Service and Support Coordinator position prior to his promotion to the position. Musgrove testified in her affidavit that she selected McGough for the following reasons: (1) McGough was the only United employee who satisfied the one year tenure rule; (2) McGough had extensive troubleshooting experience; (3) he was available to work overtime when necessary; (4) he had experience performing all the functions of the position; (5) he had trained the Technical Support Specialists; and (6) he had been satisfactorily performing the duties associated with the Service and Support position, except the supervisory functions. McGough stated that Jones lacked initiative and never assumed a leadership role in the department.

As evidence of pretext, Jones argued that Musgrove's application of United's rule that an employee must have held his or her current position for one year before being eligible to apply for

<hr>

[6]Although Jones did not apply for the position since it was not posted, where there is no formal notice of a job's availability, a plaintiff satisfies the prima facie case as long as he establishes that the company had some reason or duty to consider him for the post. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1560 (11th Cir. 1986).

12

another position was inappropriately applied, because the promotion Jones sought was in the same "job family."[7] Jones offered the May 1, 1995 announcement of the "one year" rule, which provides in part as follows:

> Within departments, managers have the discretion to move employees from one unit or team to another. Additionally, this new policy will not interrupt promotions within the same job family. ... Management may use discretion in making changes in response to business needs. These exceptions will be very limited.

(Pl.'s Exh. 21).

United argues that while it is true that the one year rule does not prevent employees from applying for promotions in the same "job family," Musgrove testified that she believed that the employee must demonstrate his or her qualifications for the position sought before the one year rule can be waived for an intra-family promotion. Furthermore, the decision as to whether the one year rule may be waived is left up to the discretion of the manager. (Second Musgrove Aff. ¶¶ 9-11).

Even assuming that Musgrove misunderstood or incorrectly interpreted the "one year" rule, it would not be evidence of pretext. As the Eleventh Circuit made clear in *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984), an employer may lawfully make a decision based on erroneous facts, so long as its action is not racially motivated. A decision-maker's mistake is not the equivalent of proof of falsity of the articulated explanation.

---

[7]Jones also argues that during Musgrove's deposition, she did not offer the "one year" rule as a reason why Jones did not receive the positon. However, Musgrove stated in her deposition that "Rod was not able to apply for [the Service and Support Coordinator position], so he doesn't have this experience to do that." (Second Musgrove Dep. at 69). Jones's counsel did not ask what Musgrove meant when she testified that Jones was not able to apply.

13

As noted, there are other articulated reasons for McGough's selection over Jones, including the fact that McGough had been performing almost all of the duties of the Service and Support Coordinator position to Musgrove's satisfaction prior to his selection for the position.

In addition, Jones alleges that Musgrove treated him in a more harsh manner than the white employees she supervised. Jones claims that Musgrove told him that she did not want him to shine as an individual in the department. Jones stated that Musgrove once replaced from being in charge of a project for no apparent reason, refused to let him fill in for McGough when McGough was absent, and had him paged when she noticed his truck was not in the parking lot.

Jones also points to positive job evaluations he received from Musgrove in November of 1994 and to performance and merit pay increases he earned in May and July of 1995 as evidence that Musgrove's criticisms of his work were unfounded. Even considering these arguments, Jones has not presented "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997), *cert. denied*, 118 S.Ct. 685 (1998). Thus, summary judgment on plaintiff's claim that defendants discriminated against him on the basis of his race in failing to promote him to the Service and Support Coordinator position is due to be granted.

## 2. Network Administrator Position Awarded to Mike Roy

Although United claims that Jones was not qualified for the position, the court will assume that Jones has met his initial burden of establishing a prima facie case with respect to the Network

14

Administrator position awarded to Mike Roy in July of 1995.[8] United has articulated legitimate, non-discriminatory reasons for Musgrove's selection of Roy. The most important qualifications for the Network Administrator position were Network experience, troubleshooting experience, Novell experience (with Novell certification preferred), hardware experience with servers, "token ring" network topology experience focusing on setting up Networks and converting Network workstations, and the employee's availability and willingness to work all hours necessary to maintain United's network computer system. Musgrove testified in her affidavit that there were numerous reasons why she selected Mike Roy over Jones, some of which are as follows: (1) Jones was not qualified to apply for the position because he had not previously worked for United for one year, and United requires, with certain exceptions, that employees hold a position for at least one year before they are eligible to apply for another position; (2) Roy demonstrated excellent job performance and had superior experience with United's network computer system; (3) Roy had more experience in Novell network applications than any other employee working in technical support; (4) Roy had Novell experience and was a certified Novell reseller and trainer; (5) Roy had been trained in token ring connectivity, which was United's network topology; (6) Roy was highly experienced in Novell operating systems and Novell networking; (7) Jones did not have the equivalent Novell experience; (8) Jones did not have the requisite knowledge of Novell networking to perform the network Administrator position; (9) Jones did not have the token ring training; and (10) Roy's training and experience was tailored towards Novell networking, while

---

[8]Although Jones did not apply for the position since it was not posted, where there is no formal notice of a job's availability, a plaintiff satisfies the prima facie case as long as he establishes that the company had some reason or duty to consider him for the post. *See Cox*, 784 F.2d at 1560.

15

Jones's training and experience was more in the area of mainframes and workstations.

Jones argues that he was as qualified as Roy for the position. However, it is the decision maker's perception that is relevant. The court will not second-guess Musgrove's business decision that Roy was the most qualified candidate, absent evidence that the reasons given by Musgrove were not the true reasons for her decision.

Jones alleges that Musgrove treated him in a more harsh manner than the white employees she supervised. Jones claims that Musgrove told him that she did not want him to shine as an individual in the department. Jones stated that Musgrove once replaced from being in charge of a project for no apparent reason, refused to let him fill in for McGough when McGough was absent, and had him paged when she noticed his truck was not in the parking lot.

As previously asserted, Jones contends that Musgrove misapplied the one-year rule. Jones also points to positive job evaluations he received from Musgrove in November of 1994 and to performance and merit pay increases he earned in May and July of 1995 as evidence that Musgrove's criticisms of his work were unfounded. Jones has not presented evidence of pretext to rebut each of defendants' legitimate nondiscriminatory reasons for the selection of Roy over the plaintiff. Thus, summary judgment on plaintiff's claim that defendants discriminated against him on the basis of his race in failing to promote him to the Network Administrator position awarded to Mike Roy is due to be granted.

### 3. Network Administrator Position Awarded to Jimmy Hamilton

Although disputed by United, the court will assume that plaintiff has established a prima facie case of race discrimination with respect to the Network Administrator position awarded to Jimmy Hamilton. Musgrove gave several legitimate, non-discriminatory reasons for her selection

16

of Jimmy Hamilton. Musgrove stated that she put a premium on network experience and that she concluded that Hamilton had more network experience than Jones. Musgrove testified in her affidavit that she selected Hamilton because he was a Certified Novell Administrator, he had four years experience working directly with computer networks, he had cabletron hubs experience, he had experience working with CISCO routers which United was planning to install, he had experience working with T-1 connections, he had experience working with Novell network applications, he had supervisory experience, and he had an excellent understanding of LAN/WAN networks. Musgrove further based her decision to hire Hamilton because he informed her that he previously had assisted AmSouth Bank relocate its network computer department to a new building and Musgrove believed that experience would prove beneficial to United, as United planned to move from its Southside location to a new Colonnade location in late 1995.

As evidence of pretext, Jones alleges that Musgrove prevented him from attending CNE (computer) training in January of 1995, while permitting three other white employees in the same department to attend. Jones claims that the duties and responsibilities of his job were at least as great as the responsibilities of the Network Administrator. Jones points out that his resume includes prior experience working on network systems. Jones also points to positive job evaluations he received from Musgrove in November of 1994, and to performance and merit pay increases he earned in May and July of 1995, as evidence that Musgrove's criticisms of his work were unfounded. These arguments do not establish pretext. Because Jones has not put forth sufficient evidence on which a reasonable jury could conclude that the reasons articulated by the defendants for the selection of Hamilton were pretext for illegal race discrimination, summary judgment on plaintiff's claim that defendants discriminated against him on the basis of his race

17

when they failed to promote him to the Network Administrator position awarded to Jimmy Hamilton is due to be granted.

## B. Retaliation

Plaintiff claims that he was subjected to illegal retaliation for filing an EEOC charge and complaining about racially discriminatory practices to management. Under Title VII, employees are protected from retaliation for opposition to unlawful employment practices or for making a charge, testifying or participating in any investigation, proceeding or hearing under Title VII. *See* 42 U.S.C. § 2000-3(a). The familiar standards of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), apply to plaintiff's claims of retaliation. In order to present a prima facie claim of retaliation, a plaintiff must demonstrate (1) that she engaged in a statutorily protected activity; (2) that the employer took some adverse employment action against her; and (3) that a causal connection exists between the two. *Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir. 1992) (citations omitted); *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir. 1989).[9] Further, timing, i.e., the fact that the adverse employment action was taken after the protected activity, is generally insufficient by itself to prove a causal connection to satisfy a prima facie case. *See Boothe v. Birmingham News Co.,* 704 F. Supp. 213, 215-17 (N.D. Ala.), *aff'd,* 864 F.2d 793 (11th Cir. 1988); *cf. Hamm v. Members of Board of Regents,* 708 F.2d 647, 652-54 (11th Cir. 1983) (holding that plaintiff failed to establish a causal link between her transfer and her activity even though she was transferred shortly after filing a written complaint with the EEOC).

---

[9]Section 1981 also provides a cause of action for retaliation. *Andrews v. Lakeshore Rehabilitation Hosp.,* 140 F.3d 1405, 1412-13 (11th Cir. 1998). The court applies the same burden-shifting standards to Section 1981 retaliation claims as used in Title VII retaliation claims.

18

Assuming a plaintiff can satisfy her prima facie case, a burden of production arises for the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Morgan,* 959 F.2d at 1547. In satisfying this burden:

> [t]he employer's burden of rebuttal is "exceedingly light." Since the rebuttal burden is one of production only, the employer "need not persuade the court that it was actually motivated by the proffered reasons . . . . It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]."

*Tipton,* 872 F.2d at 1495 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981)) (alterations in original). Thereafter, the burden shifts to plaintiff to demonstrate with probative evidence that the employer's articulated reasons for the adverse employment action are pretextual. *See id.* at 1495.

Jones contends that his suspension without pay for three days and his transfer for accessing a co-employee's personal documents was in retaliation for his EEOC charge and his complaints to management about race discrimination. In his deposition, Jones alleged that three other actions were punishment for complaining about racial discrimination. Since filing an EEOC charge and complaining about racially discriminatory practices is protected conduct, plaintiff satisfies the first prong of the prima facie test. Plaintiff must next demonstrate that he suffered an adverse employment action. The Eleventh Circuit has held that "Title VII's protection against retaliatory discrimination extends to actions which fall short of ultimate employment decisions." *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11ᵗʰ Cir. 1998). Thus, adverse employment actions include "demotions, refusals to hire, refusals to promote, and reprimands." *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11ᵗʰ Cir. 1994). However, the Eleventh Circuit has also noted that "not 'every unkind act' amounts to

19

adverse employment action." *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (citation omitted).

Among the instances of retaliation alleged by Jones in his deposition include claims that (1) Jones was instructed by his supervisor, John McGough, that he should inform McGough of Jones's whereabouts after Musgrove inquired as to where Jones was one day when Jones was missing; (2) Jones did not receive a "star" in an employee recognition program called "Shoot for the Stars"; and (3) Jones was not approved for Novell "CNE" training while other employees were. These three claims of retaliation considered separately or collectively do not rise to the level of adverse employment actions and thus cannot form the basis of a retaliation claim. *See Wideman*, 141 F.3d at 1456 ("[W]e do not doubt that there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause . . .").

United argues that Jones failed to establish the third element of his prima facie case – a causal connection. Although the causal connection requirement is interpreted broadly,[10] this court agrees that Jones has not sufficiently established a causal link between his protected activity and his discipline.

Bob Suellentrop testified in his affidavit as follows:

> I considered Mr. Jones's and Ms. Warren's actions totally inappropriate. As Network Services employees with access to other employees' network computer directories, they occupied positions of trust, which required them to refrain from invading the privacy of other employees. I considered their actions to be a breach of security as well.

---

[10] In *Meeks*, the Eleventh Circuit stated, "[W]e interpret 'the causal link requirement broadly; a plaintiff merely has to provide that the protected activity and the negative employment action are not completely unrelated.'" *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).

20

(Suellentrop Aff. ¶ 6).

Ms. Warren, who had not made any complaints of racial discrimination, was found to have breached security and received the same discipline Jones received. In addition, Jeannie Chapple and Christa Mayfield were also disciplined, although not as severely as Jones and Warren because their conduct was not deemed as egregious as the actions of Jones and Warren.

Even assuming, arguendo, that Jones established a *prima facie* case, he has failed to present sufficient evidence of pretext. Jones argues that the timing of the protected conduct and the discipline support an inference of retaliation. While timing of the alleged protected activity and the discipline are sufficient in some cases to help establish the casual connection element, timing alone is not evidence of pretext sufficient to preclude summary judgment. Jones must do more than establish a temporal proximity between the protected activity and the adverse action. Jones contends that Warren was treated differently because Warren was informed that she could reapply for her old position in Network Services after a year. However, Warren filed an Internal Dispute Resolution (IDR) grievance. As a result, she was informed that she could reapply after a year of no security breaches. Jones did not file an IDR over his discipline and never asked if he could reapply within a year. (Fagan Dep. at 299-300).

Jones argues that United's discipline of him was not based on any objective criteria. United's Employee Handbook contains a section on "Work Conduct and Discipline," which lists various examples of offenses which can result in "immediate termination." Included in that list are "breach of confidentiality relating to employer, employee, customer, or provider information" and "violations of any of UHC's employment policies including but not limited to confidentiality, security,

21

solicitation, insider trading, conflict of interest, and code of conduct." (Handbook at A3-9, Tab 7 attached to Defs' Notice of Filing Additional Evid. Materials in Support of Summ. J. on the Claims of Roddrick Jones). United's "Information Security" policy states that "Employees are responsible for: ... reporting questionable activities regarding the misuse of UHC's information resources to their supervisor/manager, HRR or the appropriate security area (i.e., Corporate Audit, Information Systems.)" (*Id.* at B2-5). The "Code of Conduct" states that "[i]t is a violation of this Code for personnel not to report a violation of the Code or any illegal activity. ... It is a violation of this Code for personnel to whom a potential illegal act of violation of the Code is reported to not ensure that the illegal act or violation of the Code comes to the attention of those responsible for investigating such reports." Accordingly, the evaluation of Jones's and Warren's misconduct was not "purely subjective."

Jones alleges that his supervisor John McGough initially showed Jones one of Christa Mayfield's personal documents and later told Jones not to report Christa Mayfield's personal documents to Musgrove. (Jones Dep. at 139-41).[11] Assuming these allegations are true, Jones cannot hide behind McGough as a result of Jones's clear violations of United's policies. Further, as United has pointed out, the issue is not whether Jones or McGough are telling the truth, but whether Suellentrop is telling the truth about why he disciplined Jones and Warren. There is no evidence that Suellentrop's reasons for disciplining Jones and Warren were not the real reasons or that Jones's protected activity was the true reason.

---

[11] McGough denies these allegations. (McGough Aff. ¶¶ 9-11). There is no evidence that United's investigation revealed that McGough was involved in the breaches of security and violations of United's policies.

22

As further evidence of pretext, Jones also alleges that during one of his meetings with Suellentrop to discuss black employees and promotions, Suellentrop allegedly stated that perhaps the reason black employees were not getting promotions was because they lacked proper interviewing techniques. This is not direct or circumstantial evidence of either racial animus or retaliation, as Suellentrop's alleged comments are subject to more than one interpretation, and are completely unrelated to discipline or retaliation. As noted, Suellentrop actually lessened Jones's punishment from termination, recommended by Musgrove, to a three-day suspension and a transfer.

Plaintiff has not presented sufficient evidence on which a reasonable jury could conclude that the reasons articulated by the defendants for the adverse action taken by defendants were a pretext for retaliatory discrimination. Thus, summary judgment on plaintiff's claim of retaliation is due to be granted.

## C. Racially Hostile Working Environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has held that Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victims's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). As the Supreme Court recently emphasized, however, Title VII is not a "general civility code" because "it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.*,

23

523 U.S. 75, __, 118 S.Ct. 998, 1003 (1998). Furthermore, the Court has emphasized the importance of employing a totality of the circumstances approach to analyzing claims of "hostile work environment":

> [T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." (citation omitted). In . . . harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.

*Id.*

Among the instances of racial harassment alleged by Jones in his deposition include claims that (1) Jones was instructed by his supervisor, John McGough, that he should inform McGough of Jones's whereabouts after Musgrove inquired as to where Jones was one day when Jones was missing; (2) Jones did not receive a "star" in an employee recognition program called "Shoot for the Stars"; and (3) Jones was not approved for Novell "CNE" training while other employees were. In addition, Jones claims that Musgrove told him that she did not want him to shine as an individual in the department. Jones stated that Musgrove once replaced from being in charge of a project for no apparent reason, refused to let him fill in for McGough when McGough was absent, and had him paged when she noticed his truck was not in the parking lot. Even assuming that all of Jones's allegations are true, the alleged conduct is not sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive working environment. Thus, summary judgment is due to be granted on Jones's claim of a racially hostile working environment.

## IV. CONCLUSION

Jones's evidence raises no genuine issues of material fact regarding any of his claims of race discrimination and retaliation and defendants are entitled to a judgment as a matter of law. Accordingly, the Motion for Summary Judgment on the Claims of Roddrick Jones is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 29th day of March, 1999.

Sharon Lovelace Blackburn
SHARON LOVELACE BLACKBURN
United States District Judge

25