FILED

99 MAR 29 AM 11: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RONALD KELLY, et al.,

Plaintiffs,

v.

UHC MANAGEMENT COMPANY, INC., a Corporation, et al.,

Defendants.

CASE NO. CV 96-B-1047-S

ENTERED
MAR 2 9 1999

MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment on the Claims of Lloyd Balfour filed by the defendants UHC Management Company, Inc., United HealthCare Corporation, and United HealthCare South, Inc. (collectively referred to as "United"). The plaintiffs[1] alleged race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). Lloyd Balfour ("Balfour") alleges that he was discriminated against with respect to salary, promotions, job assignments, and that he was retaliated against for filing an EEOC complaint. Upon consideration of the record, the submissions of both parties, the argument of counsel, and the relevant law, the court is of the opinion that United's motion is due to be granted.

---

[1] This suit at one time involved sixteen plaintiffs including former employees, current employees, and an applicant of United The claims of eleven of the plaintiffs have been stayed under the Federal Arbitration Act pursuant to this court's May 9, 1997, Order. *Kelly v. UHC Management Company, Inc.*, 967 F. Supp. 1240 (N.D. Ala. 1997). In addition, the claims of Cecelia Bryant were dismissed for her failure to comply with discovery. The claims of Tomeka Felder were dismissed by stipulation of the parties. This opinion addresses only the claims of Lloyd Balfour.

198

## I. FACTUAL SUMMARY

Balfour was hired by United's predecessor, Complete Health, on August 19, 1992, as an I-Max Technical Operator. (Balfour Dep. at 61, 95, Defs' Exh. 3; McNary Aff. ¶ 3). Balfour was the only I-Max Technical Operator at United's Birmingham, Alabama location. (Balfour Dep. at 102, 415; Musgrove Aff. ¶ 2; Musgrove Dep. at 24, 42). The I-Max Technical Operator position is a night-shift position which does not involve supervising any other employees. (Balfour Dep. at 232; Musgrove Aff. ¶ 2; Musgrove Dep. at 24; McNary Aff. ¶ 7). Balfour received a ten percent shift differential for working nights and he worked a substantial amount of overtime in the position. (Balfour Dep. at 176, 194-195, Musgrove Dep. at 115-116). In addition to his night shift I-Max Technical Operator position at United, Balfour held a full-time day job at the Alabama School of Fine Arts. (Balfour Dep. at 168-169, 230). Balfour alleges that in 1994, Musgrove and Mike Roy, his supervisors, told Balfour that his grade level would increase from a grade level seven to a grade level eight. (*Id.* at 173, 178-179).

At the time Balfour began his employment as the I-Max Technical Operator, the position was classified at a compensation grade level seven. (McNary Aff. ¶ 7). The position was subsequently reassigned an equivalent grade level twenty-two when United instituted its corporate pay grade level system. (Balfour Dep. at 101; McNary Aff. ¶ 7; Musgrove Dep. at 101). Around April of 1996, Balfour made a request to have the I-Max Technical Operator position be assigned a higher pay grade level. (McNary Supp. Aff. ¶ 5, Exh. A). Senior Human Resources Representative Melanie McNary, an African-American female, examined the job duties associated with the I-Max Technical Operator position and determined that the position was properly

classified. (*Id.*). McNary determined that the position's grade level was consistent with the grade levels for other computer operator positions of equivalent tasks and duties and with no supervisory responsibility. (*Id.*). The pay grade for the position was the same as the pay grade for all other night operators at United at its other locations throughout the country. (*Id.*).

The I-Max Technical Operator position is a night-shift position. (Balfour Dep. at 232). Balfour did not supervise any employees in his position as I-Max Technical Operator and did not have any user or vendor contact. (McNary Aff. ¶ 7). However, both the I-Max Technical Support Specialist and the I-Max Administrator positions are day positions. (McNary Supp. Aff. ¶¶ 2-3). The I-Max Administrator position is a supervisory position. The I-Max Technical Support reports directly to the I-Max Administrator. The I-Max Administrator position requires user contact at all levels including the Vice-Presidents of United and systems analyst work. The I-Max Administrator further acts as a liaison between United and outside vendors. (McNary Supp. Aff. ¶ 2). The I-Max Support Specialist, among other duties, provides support to users and provides back-up support for the I-Max Administrator including systems analyst work. (McNary Supp. Aff. ¶ 2).

In the summer of 1995, United's Network Services Department was reorganized, which resulted in the creation of the Network Administrator position. (Musgrove Supp. Aff. ¶ 2). An announcement of the opening and the job duties and qualifications for the position was not posted. Nancy Musgrove, United's Technical Development Manager, selected Mike Roy, a white male, to fill the Network Administrator position in July of 1995. (Musgrove Supp. Aff. ¶ 2). According to Musgrove, Mike Roy was selected because he was the best qualified employee for the position. (*Id.*). Musgrove concluded that Roy had more experience in Novell network

applications than any other employee working in technical support at that time. (Musgrove Supp. Aff. ¶ 4). She stated that he had experience in installing and implementing Novell operating systems, he had been trained in token ring connectivity, which was United's network topology, along with other qualifications that Musgrove believed to be beneficial to the position. (*Id.*). Musgrove testified in her affidavit that she did not select Balfour for the position because he had repeatedly refused to work day shifts and the Network Administrator position required the employee to work during the day. (Musgrove Supp. Aff. ¶ 3). Musgrove further stated that at the time Roy was selected for the position, Balfour did not have any networking experience which was a requirement of that position, and did not have the same amount of Novell networking experience as Roy. (Musgrove Supp. Aff. ¶¶ 3-4). At the time Musgrove announced Roy's promotion to the Network Administrator position, Balfour did not complain about Musgrove's selection of Roy for the position. (Musgrove Supp. Aff. ¶ 2). Roy voluntarily resigned from United in August of 1995, one month after Roy filled the position. (Musgrove Supp. Aff. ¶ 6). After he resigned, the position was posted in August of 1995. Balfour did not apply for the position when it was posted. (Musgrove Supp. Aff. ¶ 7).

In August of 1994, the position of Service and Support Coordinator became vacant and remained vacant until July of 1995. (Musgrove Aff. ¶ 8). During that time, John McGough performed the non-supervisory duties of the position as a Technical Support Specialist. (Musgrove Aff. ¶¶ 8-9). Musgrove testified that she consulted with Wendy Evesque, Human Resources Representative, and concluded that it would be pointless to post the Service and Support Coordinator position because John McGough was the only employee that met the minimum qualifications for the position. (Musgrove Aff. ¶ 12). Musgrove stated that she wanted

to fill the position internally because she wanted the Service and Support Coordinator to be familiar with the Technical Support Specialists he or she would be supervising. (Musgrove Aff. ¶ 9). According to Musgrove, John McGough was selected for the Service and Support Coordinator position because she had observed his work and considered him to be an excellent employee who took a leadership role. (Musgrove Aff. ¶ 11). He had been responsible for training all Technical Support Specialists and he had knowledge of the troubleshooting skills required for the position. (*Id.*). McGough was also available to work overtime whenever Musgrove asked him to and was eager to take on more responsibility. (*Id.*). Musgrove testified in her affidavit that she did not consider Balfour because he never indicated that he had any interest in the Service and Support Coordinator position. (Musgrove Aff. ¶ 13). Moreover, according to Musgrove, Balfour did not possess the technical skills or the supervisory and leadership skills necessary for the position. (Musgrove Aff. ¶ 10).

Balfour alleges that Jimmy Hamilton, Balfour's supervisor, told Balfour that he (Hamilton) was a "red neck." Balfour also alleges that Hamilton told Ricky Hooper, a night operator in operations, that if Balfour continued calling Hamilton at nights to discuss problems with the computer system, Hamilton was going to "kill" Balfour. (Balfour Brief at 14).[2] Finally, Balfour alleges that Hamilton told Balfour that a black prisoner escaped in the area where Hamilton lived and that Hamilton and his neighbors were all "red necks," and if they caught the prisoner they were going to "kill" him. (Balfour Dep. at 341). Co-plaintiff Roddrick Jones testified that Bob Suellentrop, CEO of United, stated that perhaps the reason black employees were not getting

---

[2] Balfour's brief cites to pages 202-204 of Balfour's deposition. Such pages were apparently inadvertently left out of Balfour's evidentiary submission to the court.

promotions was because they lacked proper interviewing techniques. (Jones Dep. at 146-147).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-movant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)

## III. DISCUSSION

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e-2(a)(1). A plaintiff alleging illegal discrimination under Title VII[3] may establish a genuine dispute as to his claim in three ways: 1) by presenting direct evidence of discriminatory intent, *see Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998) (direct evidence defined as "evidence, which if believed, proves existence of fact in issue without inference or presumption"); 2) by meeting the three-step test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or 3) by demonstrating through statistics a pattern of discrimination, *see Carter*, 132 F.3d at 642 n.5 (citing *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984)).

Since plaintiff presents no direct or statistical evidence of discrimination, he must rely on the *McDonnell Douglas* burden shifting analysis. Under the *McDonnell Douglas* framework, the plaintiff first "must establish a prima facie case of discrimination. The employer then must respond with a legitimate, nondiscriminatory reason for its actions. In order to prevail, the plaintiff must establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998), (citing *Walker v. NationsBank of Fla. N.A.* 53 F.3d 1548, 1556 (11th Cir. 1995)). Despite the burden shifts in the *McDonnell Douglas* test, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997).

---

[3]Where a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under Section 1981, the legal elements of the claims are the same and thus the claims need not be discussed separately. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985).

**A. Salary Claim**

In order to establish a prima facie case of race discrimination based on salary disparity, Balfour must prove that (1) he is member of a protected minority; and (2) he occupied a position similar to non-minority employees who were compensated at a higher rate than Balfour. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992).

Balfour has failed to establish a prima facie case with respect to his compensation claim. Balfour claims white employees who perform the positions I-Max Technical Support Specialist and I-Max Administrator positions are compensated at a higher grade. (Balfour Brief at 2-3). These positions do not have similar responsibilities to the I-Max Technical Operator position. Both the I-Max Technical Support Specialist and the I-Max Administrator positions are day positions. The I-Max Administrator position is a supervisory position. The I-Max Technical Support reports directly to the I-Max Administrator. The I-Max Administrator position requires user contact at all levels including the Vice-Presidents of United and systems analyst work. The I-Max Administrator further acts as a liaison between United and outside vendors. The I-Max Support Specialist, among other duties, provides support to users and provides back-up support for the I-Max Administrator including systems analyst work.

The I-Max Technical Operator position is a night-shift position. Balfour did not supervise any employees in his position as I-Max Technical Operator and did not have any user or vendor contact. He therefore did not perform similar duties and similar responsibilities as the I-Max Administrator and I-Max Technical Support Specialist. He therefore cannot establish a prima facie case of salary discrimination.

Even assuming a prima facie case, Balfour has not presented evidence of pretext sufficient to rebut United's articulated legitimate, non-discriminatory reasons for the alleged salary disparity. United asserts that it paid Balfour less than the I-Max Technical Support Specialist and I-Max Administrator because his job duties and responsibilities were not the same as those of the people employed in those positions. When Balfour requested that his position be evaluated, Melanie McNary examined the job duties he performed. She determined that the pay grade for Balfour's position was in line with other similar positions at United. There is no evidence that Balfour disputed McNary's conclusion. McNary's notes indicate only that Balfour did not believe that all of his duties were being considered. After Balfour informed McNary of his additional duties, McNary concluded that they were not significant enough to impact his position's pay grade. (McNary Supp. Aff., Ex. A).

In support of his argument of pretext, Balfour alleges that in 1994, Musgrove and Mike Roy, his supervisors, told Balfour that his grade level would increase from a grade 7 to a grade 8. This allegation is not evidence that Balfour's position was not upgraded because of his race or that the reasons articulated by United for not upgrading the position are not the true reasons. *See Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1048 n.7 (5th Cir. 1996) (allegation that head coach represented to black assistant coach that he would be paid at same level as white assistant coach does not constitute evidence of pretext because it does not "show that the proffered nondiscriminatory reason was not the cause of the wage differential."). Moreover, Musgrove and Roy were not the decision makers with respect to Balfour's request to receive a higher pay grade. Rather, Melanie McNary, a black female, evaluated Balfour's position to determine if a higher pay grade was appropriate. Balfour has not produced evidence sufficient to lead a reasonable jury to

conclude that the proffered reasons for the pay differential were a pretext for illegal race discrimination. Thus, summary judgment on plaintiff's claim of discrimination based on salary is due to be granted.

**B. Promotion Claims**

In order to demonstrate a prima facie case for discriminatory failure to promote,[4] a plaintiff must show that: 1) she is a member of a protected class; 2) she was qualified for and applied for the promotion; 3) she was rejected in spite of her qualifications; and 4) the individual who received the promotion is not in a protected group and had lesser or equal qualifications. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998).

**1. Services and Support Coordinator position**

Balfour alleges that he was discriminated against with respect to the Service and Support Coordinator position. Balfour is an African-American male who was qualified for this position but was rejected despite his qualifications.[5] The individual who received the promotion was white and drawing all inferences in favor of the plaintiff, possessed equal qualifications to Balfour for the position. The court will assume Balfour has met his initial burden of establishing a prima facie case with respect to the Service and Support Coordinator position filled by John McGough in July

---

[4]In his brief to the court, Balfour asserts that he did not claim discrimination with respect to the following positions: I-Max Administrator position posted in July of 1994; Network Administrator position posted in August of 1995; and the Manager of Network Services position posted in July of 1996. (Pls' Resp. in Opp'n to Defs' Summ. J. Mot. On the Claims of Pl. Lloyd Balfour at 8 n.1).

[5]Although Balfour did not apply for the position since it was not posted, where there is no formal notice of a job's availability, a plaintiff satisfies the prima facie case as long as he establishes that the company had some reason or duty to consider him for the post. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1560 (11th Cir. 1986).

of 1995.

United has articulated legitimate, non-discriminatory reasons for McGough's selection. Prior to his selection for the Service and Support Coordinator position, McGough was performing the nonsupervisory duties of the position. According to Musgrove, John McGough was selected for the Service and Support Coordinator position because she had observed his work and considered him to be an excellent employee who took a leadership role. He had been responsible for training all Technical Support Specialists, and he had knowledge of the troubleshooting skills required for the position. McGough was also available to work overtime whenever Musgrove asked him to and was eager to take on more responsibility. Musgrove testified in her affidavit that she did not consider Balfour because he never indicated that he had any interest in the Service and Support Coordinator position. Moreover, according to Musgrove, Balfour did not possess the technical skills or the supervisory and leadership skills necessary for the position.

Balfour offers statements from United employees in support of his argument of pretext. Balfour alleges that Jimmy Hamilton, Balfour's supervisor, told Balfour that he (Hamilton) was a "red neck." Balfour also alleges that Hamilton told Ricky Hooper, a night operator in operations, that if Balfour continued calling Hamilton at nights to discuss problems with the computer system, Hamilton was going to "kill" Balfour.[6] Finally, Balfour alleges that Hamilton told Balfour that a black prisoner escaped in the area where Hamilton lived and that Hamilton and his neighbors were

---

[6] Hooper's statement to Balfour regarding what Hamilton allegedly stated to Hooper is inadmissible hearsay, and therefore, should not be considered in determining whether summary judgment is appropriate. However, even if considered, such alleged statement does not support Balfour's argument of pretext, as discussed *infra*.

all "red necks," and if they caught the prisoner they were going to "kill" him. Balfour further relies on co-plaintiff Roddrick Jones's testimony that Bob Suellentrop, CEO of United, allegedly stated that perhaps the reason black employees were not getting promotions was because they lacked proper interviewing techniques.

Assuming the alleged statements constitute evidence of racial discrimination, they are not evidence of pretext with respect to the Services and Support Coordinator position. Hamilton and Suellentrop were not the decision makers. Alleged racial slurs by non-decision makers do not constitute evidence of pretext. *See Trotter v. Board of Trustees of Univ. of Ala.*, 91 F.3d 1449, 1454 (11th Cir. 1996) (plaintiffs cannot rely on racial statement by non-decision maker to prove racial discrimination); *Barber v. International Brotherhood of Boilermakers*, 778 F.2d 750, 761 (11th Cir. 1985) (racial slurs by non-decision makers are insufficient to establish pretext).

Balfour also offers evidence that he received a performance bonus in May of 1995, a merit increase in July of 1995, and a performance evaluation for the period of August, 1994, to August of 1995, by Musgrove. These actions allegedly indicate that Balfour met or exceeded the expectations in the majority of the categories listed. (Pl.'s Exhs 5, 14, 15).[7] However, Musgrove could have found Balfour competent in the I-Max Technical Operator position but not qualified or as qualified as McGough for the Services and Support Coordinator position.

In addition, Balfour alleges that United's selection of McGough for the Services and Support Coordinator position was based on subjective and unwritten criteria and that no notice of

---

7 Balfour also submitted an October, 1995, memorandum from Musgrove to Balfour thanking him for "the excellent job you did last weekend during our crisis." (Balfour Dep., DX 13, Tab 16 to Balfour's Evidentiary Submission). The memorandum was written after McGough's promotion to the Services and Support Coordinator position. It therefore has no relevance to Musgrove's decision in July of 1995.

availability was posted for the position. Plaintiff alleges that these actions support a finding of discrimination. While the cases relied on by Balfour state that subjective decision-making may be suspect, they do not aid Balfour's argument of pretext in this case. Even assuming Musgrove's decision was wholly subjective, subjective decision-making alone is insufficient to establish pretext.

As discussed, the evidence in the record, including Balfour's argument that he is better qualified and that defendant relied upon subjective criteria, could not lead a reasonable jury to conclude that the proffered reasons for the decision were pretext for illegal race discrimination. Accordingly, summary judgment on plaintiff's claim that he was denied a promotion to the Service and Support Coordinator position in 1995 on the basis of his race, is due to be granted.

**2. Network Administrator position**

Balfour alleges that he was discriminated against with respect to the Network Administrator position. Balfour is an African-American male who was qualified for this position but was rejected despite his qualifications.[8] The individual who received the promotion was white and, drawing all inferences in plaintiff's favor possessed equal qualifications to Balfour for the position. Thus, Balfour has met his initial burden of establishing a prima facie case with respect to the Network Administrator position filled by Mike Roy in July of 1995.

---

[8]Although Balfour did not apply for the position since it was not posted, where there is no formal notice of a job's availability, a plaintiff satisfies the prima facie case as long as he establishes that the company had some reason or duty to consider him for the post. *See Cox*, 784 F.2d at 1560.

United has articulated legitimate, non-discriminatory reasons for Musgrove's selection of Mike Roy. According to Musgrove, Roy possessed the most experience and qualifications for the position. Further, Musgrove believed that Balfour lacked the requisite networking experience for the position and that he was not interested in working day-shift work. Musgrove's conclusion that Balfour was not interested in day-shift work is supported by the fact that when the Network Administrator position became vacant in August of 1995 and was posted, only one month after Roy's promotion to the position, Balfour did not even apply for the position. Balfour testified that he would not even consider a daytime position at United unless the salary for such position was at least $74,000.00 a year, presumptively because Balfour would have to give up his day job at the Alabama School of Fine Arts. (Balfour Dep. at 170-171). While the record is unclear as to the salary of the Network Administrator position, which was a grade level 10, there is evidence that Balfour's 1995 annual salary, without overtime, in a grade level 7 position was $24,800.00, and that annual salaries for grade levels 8 and 9 positions were around $25,000.00 to $35,000.00. (Pl.'s Evid. Submission, Tabs 3, 5, 7, 17). It is accordingly unlikely that the annual salary for a grade level 10 position reached $74,000.00.

As evidence of pretext, plaintiff argues that he was clearly more qualified than Roy. Balfour points out that he has a bachelor of science degree in computer science. Conversely, there is no evidence that Roy ever earned his degree. However, Balfour's argument that he is better qualified than Roy coupled with all the other evidence in the record, could not lead a reasonable jury to conclude that defendants' proffered reasons for the decision were pretext for illegal race discrimination. Thus, summary judgment on plaintiff's claim that he was denied a

promotion to Network Administrator in July of 1995 on the basis of his race is due to be granted.

**C. Retaliation**

Plaintiff claims that he was subjected to illegal retaliation for filing an EEOC charge. Under Title VII, employees are protected from retaliation for opposition to unlawful employment practices or for making a charge, testifying or participating in any investigation, proceeding or hearing under Title VII. *See* 42 U.S.C. § 2000-3(a). The familiar standards of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), apply to plaintiff's claims of retaliation. In order to present a prima facie claim of retaliation, a plaintiff must demonstrate (1) that he engaged in a statutorily protected activity; (2) that the employer took some adverse employment action against him; and (3) that a causal connection exists between the two. *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992) (citations omitted); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). Further, timing, i.e., the fact that the adverse employment action was taken after the protected activity, is generally insufficient by itself to prove a causal connection to satisfy a prima facie case. *See Boothe v. Birmingham News Co.*, 704 F. Supp. 213, 215-17 (N.D. Ala.), *aff'd*, 864 F.2d 793 (11th Cir. 1988); *cf. Hamm v. Members of Board of Regents*, 708 F.2d 647, 652-54 (11th Cir. 1983) (holding that plaintiff failed to establish a causal link between her transfer and her activity even though she was transferred shortly after filing a written complaint with the EEOC).

Assuming a plaintiff can satisfy his prima facie case, a burden of production arises for the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Morgan*, 959 F.2d at 1547. In satisfying this burden:

> [t]he employer's burden of rebuttal is "exceedingly light." Since the rebuttal burden is one of production only, the employer "need not persuade the court that it was actually motivated by the proffered reasons . . . . It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]."

*Tipton*, 872 F.2d at 1495 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)) (alterations in original). Thereafter, the burden shifts to plaintiff to demonstrate with probative evidence that the employer's articulated reasons for the adverse employment action are pretextual. *See id.* at 1495.

Balfour has not established a prima facie case of retaliation. Balfour claims that his written warning for sleeping on the job, dated June 6, 1996, was done in retaliation for his EEOC complaint. Defendants allege that the warning was given in order to ensure that plaintiff did not continue to sleep on the job and note that Balfour was not suspended nor was his pay docked. Balfour filed his charge of discrimination with the EEOC on November 20, 1995, and on February 22, 1996, he filed an amended charge. This time span is too great to infer a connection between the two without any additional evidence, which plaintiff has not offered. *See, Balleti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1549 (S.D. Fla. 1995) (elapse of six months between grievance and discharge did not permit inference of causal connection);*Juarez v. Ameritech Mobile Communications, Inc.*, 746 F. Supp. 798, 804 (N.D. Ill. 1990) (six months between complaint and termination too remote), *aff'd*, 957 F.2d 317 (7th Cir. 1992); *Maldonado v. Metra*, 743 F. Supp. 563, 568 (N.D. Ill. 1990) (five months lapse between protected expression and termination too remote); *Reeves v. Digital Equipment Corp.*, 710 F. Supp. 675, 677 (N.D. Ohio 1989) (no retaliation where three months passed between protected expression and adverse employment action).

Even if Balfour had established a prima facie case of retaliation, he has not offered sufficient evidence of pretext. Balfour offered no evidence that his written warning was in retaliation for his EEOC charge and failed to even mention his retaliation claim in his Response in Opposition to Defendants' Summary Judgment Motion on the Claims of Plaintiff Lloyd Balfour. Thus, because no reasonable jury could find that Balfour's warning for sleeping on the job was in retaliation for his filing of an EEOC charge, summary judgment on his claim of retaliation is due to be granted.

**D. Job Assignments and Training**

Balfour alleges that United discriminated against him by giving him the following job assignments: (a) cleaning optical servers (Balfour Dep. at 123); (b) cleaning and vacuuming PCs (*Id.*); (c) rebuilding database files (*Id.* at 147-49); and (d) rebuilding corrupted DTA files (*Id.* at 160-63). Balfour also claims that he was discriminated against because he missed a training date. Balfour claims that he was told that the training was on Thursday and Friday when it actually was Wednesday and Thursday. (*Id.* at 348; Hamilton Aff. ¶ 4, Exh. A).

In order for a plaintiff to have a cause of action pursuant to Title VII, he must have suffered an adverse employment action. Adverse employment actions include "demotions, refusals to hire, refusals to promote, and reprimands." *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994). However, the Eleventh Circuit has also noted that "not 'every unkind act' amounts to adverse employment action." *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (citation omitted). The aforementioned acts which Balfour claims were discriminatory are not adverse employment actions and cannot form the basis for a cause of action under Title VII. Thus, summary judgment on plaintiff's claims of discrimination in regard to the

aforementioned job assignments and training sessions is due to be granted.

## IV. CONCLUSION

The court concludes that the Motion for Summary Judgment on the Claims of Lloyd Balfour is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 29th day of March, 1999.

SHARON LOVELACE BLACKBURN
United States District Judge